Argued and submitted July 15, 2004, on appeal, judgment in favor of all plaintiffs on claim for penalty wages under ORS 652.150 modified to begin penalty period on November 11, 1999, and to include prejudgment interest; judgment against Subclass B on claim for penalty wages under ORS 652.150 based on unauthorized deductions of insurance premiums reversed; judgment against Subclass B on claim for penalty wages based on failure timely to pay severance pay reversed; judgment against Subclass C on claims for penalties under ORS 652.615 reversed; otherwise affirmed; affirmed on cross-appeal February 23, 2005

## Gregory L. WILSON,
### Larry G. Chastain, George O. Kendall, Catherine Poe, David W. Blank, and Catherine Sale,
*Appellants - Cross-Respondents,*

*v.*

## SMURFIT NEWSPRINT CORPORATION,
*Respondent - Cross-Appellant.*

### 9912-13689; A120585

107 P3d 61

649-a

Christina L. Beatty-Walters argued the cause for appellants - cross-respondents. With her on the briefs were Steve D. Larson, Stoll Stoll Berne Lokting & Shlachter, P.C., Barton C. Bobbitt, and Barton C. Bobbitt, P.C.

Andrew M. Altschul argued the cause for respondent - cross-appellant. With him on the briefs were Joel A. Mullin and Stoel Rives LLP.

Before Edmonds, Presiding Judge, and Landau and Schuman, Judges.

SCHUMAN, J.

Edmonds, P. J., concurring in part and dissenting in part.

## SCHUMAN, J.

Plaintiffs were working for defendant Smurfit Newsprint Corporation at its Newberg paper mill when defendant sold the mill to another company. In this class action, plaintiffs characterize the sale as a termination of their employment and allege that defendant did not pay them various forms of earned compensation within one business day, thereby entitling them to statutory penalties. *See* ORS 652.140 (imposing time limit); ORS 652.150 (establishing penalty). A subclass of plaintiffs also seeks damages from defendant for an alleged violation of ORS 652.610(3), which prohibits unauthorized payroll deductions. After several rounds of summary judgment motions, the trial court concluded that plaintiffs were entitled to some of the relief they sought but not all of it. Plaintiffs appeal and defendant cross-appeals.

Both the grant and denial of the parties' summary judgment motions are subject to review, *Cochran v. Connell*, 53 Or App 933, 939, 632 P2d 1385, *rev den*, 292 Or 109 (1981), and we review both according to the same standard: summary judgment is appropriate if the evidence in the record and all reasonable inferences that may be drawn from it, viewed in the light most favorable to the nonmoving party, disclose no issue of material fact, and the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 407-08, 939 P2d 608 (1997).

In the fall of 1999, defendant notified its employees, including plaintiffs, that it intended to sell its Newberg facility to Southeast Paper Manufacturing Company (SP). The notice alerted the employees that November 10, the day of the sale, would be their "employment termination date." The sale occurred as planned.

The contract between defendant and SP required SP to "offer employment to substantially all" of defendant's employees. As a condition of working for SP, however, the employees had to reapply and to pass a drug test, and union employees lost any seniority rights that they had accumulated while working for defendant. All but five of defendant's

approximately 300 employees were subsequently rehired by SP. The rehired employees lost no work time due to the sale, experienced no gap in their medical insurance coverage, and most underwent no change in assignment. When they left work on November 9, they worked for Smurfit; when they arrived at work on November 10, they worked for SP. Union employees received their final paychecks from Smurfit and their first checks from SP on November 19, and nonunion employees received their final Smurfit and first SP paychecks on November 15 or shortly thereafter.

Plaintiffs then initiated this class action seeking civil penalties from defendant under ORS 652.140(1) and ORS 652.150(1) for untimely payment of wages after termination. ORS 652.140(1) provides, in part:

> "Whenever an employer discharges an employee or where such employment is terminated by mutual agreement, all wages earned and unpaid at the time of such discharge or termination shall become due and payable not later than the end of the first business day after the discharge or termination."

ORS 652.150(1), in turn, imposes penalties on employers who violate ORS 652.140(1):

> "[I]f an employer willfully fails to pay any wages or compensation of any employee whose employment ceases, as provided in ORS 652.140 * * *, then, as a penalty for such nonpayment, the wages or compensation of such employee shall continue from the due date thereof at the same hourly rate for eight hours per day until paid or until action therefor is commenced. However, in no case shall such wages or compensation continue for more than 30 days from the due date."

Some plaintiffs also sought penalties under ORS 652.615. That statute creates a private right of action against an employer who makes unauthorized deductions from an employee's wages contrary to ORS 652.610(3), which provides that, with certain exceptions not relevant here, "[n]o employer may withhold, deduct or divert any portion of an employee's wages" without written authorization from the employee.

The court ultimately divided the plaintiff class into subclasses. Subclass A consists of defendant's employees who were not subsequently employed by SP. Plaintiffs in that subclass reached a settlement with defendant and are not parties to this appeal. Subclass B consists of all defendant's employees who worked at the Newberg facility at the time of its sale and were rehired by SP. Subclass C, itself a subclass of Subclass B, consists of defendant's nonunion, salaried employees who were exempt from overtime compensation. In an attempt to minimize confusion, we adopt the following shorthand labels for the different groups: Subclass B is "all plaintiffs," consisting of "union plaintiffs" and "salaried plaintiffs."[1]

All plaintiffs sought penalty wages under ORS 652.150 on the theory that defendant did not timely pay them their accumulated regular earnings until their next payday, November 15 (for salaried plaintiffs) or November 19 (for union plaintiffs). That penalty would be in the amount of their regular earnings between the day after their termination and the time they were paid, that is, November 15 or 19.

In addition to the penalties for late payment of earned regular wages, union plaintiffs also sought penalties because defendant did not timely pay them the severance benefits that they claimed they were entitled to under their collective bargaining agreement (CBA). Because defendant had not paid that amount after 30 days, that penalty would be in the amount of their regular earnings for 30 days.

Salaried plaintiffs, in addition to the penalty for late payment of earned regular wages, sought a penalty based on the theory that defendant unlawfully withheld medical insurance payments from their last paychecks. According to salaried plaintiffs, because that unlawful withholding violated two statutes, ORS 652.150(1) and ORS 652.610(3), it subjected defendant to two separate penalties.

---

[1] As noted, these terms do not literally describe the groups' membership. Some members of the group we call "union plaintiffs" are not union members and some salaried plaintiffs are not salaried, nonunion, overtime-exempt plaintiffs.

Union plaintiffs' claim regarding penalties for untimely payment of severance benefits was submitted to arbitration as required by the CBA.[2] The arbitrator concluded that, when defendant sold its business to SP, union plaintiffs were "terminated" and that defendant violated the CBA by failing to provide severance benefits to them at that time. The arbitrator's award was upheld on appeal to the United States District Court of Oregon and the Ninth Circuit Court of Appeals. *Smurfit Newsprint Corp. v. Ass'n of Western Pulp and Paper Workers, Local 60*, 59 Fed Appx 207 (9th Cir 2003); *Smurfit Newsprint Corp. v. Ass'n of Western Pulp and Paper Workers, Local 60,* No Civ 01-953-AS, 2001 WL 34043382 (D Or, Aug 14, 2001).

Meanwhile, after several rounds of summary judgment motions, the trial court concluded that defendant owed union plaintiffs penalties for failing to pay their regular wages on time but not for failing to pay severance benefits on time.[3] Regarding salaried plaintiffs, the court concluded that defendant owed them penalties for failing to pay their regular wages on time but not for unauthorized insurance deductions. Further, the court denied all plaintiffs' requests for prejudgment interest and awarded plaintiffs approximately $145,000 in attorney fees. Judgment was entered accordingly.

On appeal, plaintiffs maintain that the sale of defendant's facility amounted to a termination of their employment and that defendant failed to pay them regular wages, and, severance benefits. They, also maintain that defendant unlawfully withheld medical insurance premium payments. Finally, they also argue that they should receive prejudgment interest on their penalty wages. Defendant, on the other hand, maintains on cross-appeal that the sale of its plant was not a termination of employment because plaintiffs continued performing their presale jobs with no change in the

---

[2] The issue of late payment of regular wages was not arbitrated.

[3] The arbitrator's decision and the trial court's decision are not inconsistent. The arbitrator decided only that union plaintiffs were entitled to severance benefits; the issue of whether they were also entitled to *penalties* for not having received those benefits on time is a separate issue and was not arbitrated.

terms and conditions of their employment and that, if there was a termination, then defendant owed penalties only for unpaid regular wages and not for severance benefits or withheld medical insurance premium payments.

To respond to the parties' assignments of error, we must therefore address the following questions: First, did the sale of defendant's plant amount to a termination of plaintiffs' employment? Second, if so, was Veterans Day, November 11, a "business day" for purposes of determining the number of days between the termination and plaintiffs' receipt of their wages? Third, did defendant "willfully" fail to pay union employees' "earned and unpaid" severance benefits? Fourth, did the court err in certifying salaried plaintiffs as a class for purposes of maintaining a class action? Fifth, if not, did defendant unlawfully withhold medical insurance premiums from class members' final paychecks; or, if so, did that withholding expose defendant to penalties under both ORS 652.150 and ORS 652.615? Sixth, should plaintiffs receive prejudgment interest on any or all of their penalty wages? And seventh, did the court correctly award plaintiffs their attorney fees?

## I. TERMINATION OF EMPLOYMENT

 Whether plaintiffs were "terminated" when defendant sold its Newberg facility on November 10, 1999, turns on the meaning of the term as it is used in ORS 652.140(1).[4] The statute does not define "terminate," but the Supreme Court did so for purposes of the statute in *State ex rel Nilsen v. Johnston*, 233 Or 103, 108-09, 377 P2d 331 (1962), and that definition "becomes a part of the statute as if written into it at the time of its enactment." *Walther v. SAIF Corp.*, 312 Or 147, 149, 817 P2d 292 (1991). In *Johnston*, the Supreme Court held that the "[t]ermination of employment contemplates a severance of the employment relationship rather

---

[4] "[W]hether there was a termination [for purposes of that statute is] for the trier of fact to resolve from a consideration of all the circumstances." *State ex rel Nilsen v. Johnston*, 233 Or 103, 108-09, 377 P2d 331 (1962). However, where, as here, the historical facts are undisputed, the question becomes one of law. *Lamy v. Jack Jarvis & Company, Inc.*, 281 Or 307, 313, 574 P2d 1107 (1978). That is so because in such circumstances the question is purely one of statutory interpretation.

than a mere temporary cessation of work." 233 Or at 108. By focusing the inquiry on the relationship between employer and employee, as opposed to the terms and conditions of employment, the court strongly suggested that, when a business is sold, its employees undergo a termination of employment; one employment relationship ends and another begins, even if the employee's job description does not change.

That suggestion finds confirmation in the context of ORS 652.140(1), in particular in another part of the same statute, ORS 652.140(6), which provides:

> "When a termination of employment results from the sale of a business or business property and the purchaser employs or continues the employment of an individual employed at the business, this section does not apply to the payment to such an individual of wages for earned but unused accrued holiday leave, sick leave, vacation leave or other leave benefits payable upon termination of employment pursuant to a collective bargaining or other employment agreement or employer policy[.]"

The subsection establishes beyond doubt that the legislature understood "termination of employment" in ORS 652.140 to "result" when a business is sold, even if the employee "continues the employment." In that situation, an employer has no duty to accelerate payment of specified wages (those for "earned but unused accrued holiday leave, sick leave," etc.); the obvious negative implication is that an employer *does* have a duty to accelerate the *un*specified wages. The wages at issue in this case do not fall into any of the categories for which acceleration need not occur.

Further, even if some business sales might not result in termination, the present one surely did. The undisputed facts in the summary judgment record demonstrate that the transition between plaintiffs' employment with defendant and their employment with SP was not, as defendant contends, seamless. No plaintiff had a guaranteed job with SP. All had to apply for employment and submit to drug testing. Union members lost their seniority, with adverse consequences for their retirement dates and pensions. Further, defendant referred to plaintiffs' "employment termination date" in a notice occasioned by the pending sale, and it

informed plaintiffs that its coverage of pension and insurance benefits would end as of November 10, 1999. By any measure, the employment relationship between defendant and all plaintiffs ended on that date.

Defendant cites a number of federal cases for the proposition that sale of a business does not necessarily cause a termination of the business's employees, but those cases do not involve Oregon law; in fact, most do not involve laws or contracts that, like the statute in this case, were designed to "discourage an employer from using a position of economic superiority as a lever to dissuade an employee from promptly collecting * * * agreed compensation." *State ex rel Nilsen v. Ore. Motor Ass'n*, 248 Or 133, 138, 432 P2d 512 (1967). Rather, the federal cases deal with statutes or contracts designed to protect employees from hardship during periods of unemployment between the loss of one job and the start of another. *E.g., Adams v. Thiokol Corp.*, 231 F3d 837, 847 (11th Cir 2000); *Lakey v. Remington Arms Co., Inc.*, 874 F2d 541, 545 (8th Cir 1989); *Sly v. P.R. Mallory & Co.*, 712 F2d 1209 (7th Cir 1983). In that context, it makes sense to define "termination" so as to exclude situations in which an employee moves from one employment relationship to another with no gap in pay or benefits. But where, as here, the purpose is to deter former employers from exploiting their economic superiority, it makes no difference whether or not the former employer was immediately replaced with a new one; a former employer is as likely to exploit a superior economic position when the transition to new employment is seamless as when it is not.

In short, all plaintiffs were terminated for purposes of ORS 652.140(1) and ORS 652.150(3) when defendant sold its Newberg facility to SP, and the trial court did not err in so concluding. Because defendant concedes that its nonpayment of regular wages until the next scheduled payday was "willful," we affirm the trial court's grant of plaintiffs' motion for summary judgment with respect to their claim for penalty wages owed as a result of defendant's failure to pay regular wages within one business day of termination.

## II. "FIRST BUSINESS DAY" AFTER TERMINATION

ORS 652.140(1) provides that wages "become due and payable not later than the *end of the first business day* after the discharge or termination." (Emphasis added.) Having determined that plaintiffs were terminated on November 10, the trial court concluded that, because November 11, Veterans Day, was not a business day, wages were not due until November 12. Plaintiffs argue that Veterans Day was not a holiday but a business day and that therefore the trial court's award of penalties for failure to pay regular wages included one day's wages too few.

The statute does not define "business day." However, it does refer in some subsections to "business day" and in other subsections to days "excluding Saturdays, Sundays, and holidays." It is therefore logical to consider the term "business day" as a complement to any day that is not a Saturday, Sunday, or holiday; in other words, if a day is not a weekend or holiday, it is a business day. A holiday, generally speaking and in the context of employment law, is a day off from work. *See Webster's Third New Int'l Dictionary* 1080 (unabridged ed 2002) ("a day on which one is exempt from one's usual labor or vocational activity"). Defendant's CBA with its unionized employees treated Veterans Day as a regular work day and not a holiday; in listing the holidays for which employees who worked would receive extra pay, the CBA did not include Veterans Day. Employees were required to report for work on Veterans Day at their normal rate of pay, and plaintiffs, in fact, did so. We conclude that, because Veterans Day was not a weekend and neither defendant nor its employees considered it to be a holiday or treated it as such, it was a business day.

We recognize that Bureau of Labor and Industries (BOLI) regulations define "business day" in such a way as to exclude Veterans Day. Under OAR 839-001-0410(1) a business day is "Monday through Friday, exclusive of state holidays as provided in ORS 187.010, in which the business operations of the employer is conducted." ORS 187.010(1)(h), in turn, lists Veterans Day as a legal holiday. However, BOLI is

not a party in this case and it does not have independent authority to enforce ORS 652.140; that statute carries a private enforcement mechanism, ORS 652.150.[5] Further, ORS 187.010(4) provides that "[i]n enumerating legal holidays * * * the Legislative Assembly does not intend to limit or otherwise affect public or private collective bargaining * * * agreements." In this instance, the private agreement between defendant and its employees supersedes the statutory definition. On remand, the court should treat November 11 as the day on which plaintiffs' wages were due.

## III. SEVERANCE BENEFITS

■ The CBA between defendant and its unionized employees provided that, subject to certain exceptions that are not relevant to this appeal, any "employee with five (5) or more full years of continuous service" would receive "termination pay" at the rate of 40 hours' wages for "each full year of service" but only "[i]n the event the company should decide *to close permanently* the Newberg mill or one of the major departments of the mill." (Emphasis added.) Some of the union plaintiffs had five or more years' service, but defendant, asserting that no plant closure had occurred, did not pay them severance benefits within one business day of the company's sale. Instead, defendant submitted the claim to arbitration as provided in the CBA and did not pay union plaintiffs until after the arbitrator decided the issue in plaintiffs' favor, the district court affirmed the arbitrator's decision, and the Ninth Circuit affirmed the federal district court. Qualified union plaintiffs claim that the nonpayment violated the accelerated payment requirement of ORS 652.140(1), thereby entitling them to the penalties from defendant under ORS 652.150(3).[6] The trial court, ruling approximately two months after the arbitrator's final decision but before that decision was affirmed on judicial review, rejected union plaintiffs' claim, concluding that defendant's

---

[5] The commissioner of BOLI may "[t]ake assignments" of wage claims, ORS 652.330(1)(b), but it has not done so in this case.

[6] These plaintiffs do not seek 30 days of penalties over and above the amount they receive for late payment of regular wages but only the additional amount that would equal a total of 30 days of penalties.

failure to pay severance benefits did not violate ORS 652.140(1).

ORS 652.150 entitles an employee to penalty wages if (1) his or her employment is terminated and the employer (2) willfully fails to pay, (3) within one business day, (4) wages that are (5) earned and unpaid at the time of the termination. We have already held that plaintiffs were terminated on November 10, 1999, and that defendant did not pay any form of compensation within the required time period. Severance pay is "wages" for purposes of ORS chapter 652. *See Ore. Motor Ass'n*, 248 Or at 136 ("wages" means "*all* earned compensation contracted to be paid by the employer for the employee's personal service regardless of the nature of such compensation" (emphasis in original)); *see generally Wyatt v. Body Imaging, P.C.*, 163 Or App 526, 539-40, 989 P2d 36 (1999), *rev den,* 330 Or 252 (2000) (collecting definitions). The only plaintiffs claiming penalties for unpaid severance benefits are those who had "earned" them by working a sufficient number of years for defendant. Thus, the only remaining inquiry is whether defendant's failure to pay severance benefits was "willful."

In *Johnston*, the court, rejecting various constitutional challenges to ORS 652.150, discussed "willfulness" and adopted a definition of that term:

"[T]he defendants have placed before us numerous hypothetical situations which they claim demonstrate the vagueness, the arbitrariness and the discrimination which the statute fosters. A theme common to each of these examples depicts an unwary employer who has been trapped into subjecting himself to a penalty because he was unaware either that the employee's employment had been terminated or that the employee had actually done the amount of work which he claimed he had done. Throughout their brief the defendants proceed on the assumption that an employer who has made an honest and innocent error either in computing what he owes an employee or in assuming that his employee is still in his employ is unfairly penalized for making this error.

"The assumption overlooks the fact that ORS 652.150 operates only where the employer has 'wilfully' failed to meet the obligations outlined in ORS 652.140. Its purpose

is to protect employees from unscrupulous or careless employers who fail to compensate their employees although they are fully aware of their obligation to do so. In *Nordling v. Johnston* * * *, this court said: 'The meaning of the term "wilful" in the statute is correctly stated in *Davis v. Morris*, 37 Cal App 2d 269, 99 P2d 345.' We now quote the definition thus adopted:

> " '* * * In civil cases the word "wilful," as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent.'

> "That definition excludes the individual who does not know that his employee has left his employ or who has made an unintentional miscalculation. We must conclude, therefore, that the defendants' assumption is erroneous and that their hypotheticals do not apply to the statute under consideration."

233 Or at 107-08. An employer, then, willfully fails to pay wages owed at termination only if it is "fully aware of [its] obligation to do so" but nonetheless consciously and voluntarily decides not to fulfill that obligation. The employer's awareness is described in terms of knowledge and intent.

Unfortunately, the *Johnston* discussion and definition at least partially beg the issues: "Full awareness" or knowledge *of what*? Of the historical facts that would establish a *prima facie* case that the obligation exists? What if the employer knows that it owes wages but believes in good faith that the employee has done something that would justify an offset? What about negligent or reckless lack of knowledge? The discussion appears to imply a good faith standard: an "unintentional" miscalculation is not willful, but, by negative implication, an intentional or reckless one is.

Subsequent cases have addressed some of these questions. In *State ex rel Nilsen v. Lee*, 251 Or 284, 444 P2d 548 (1968), the defendants failed to pay wages owed at termination but the evidence did not disclose that they were aware of their liability; they believed, erroneously, that they

were not liable because they were not actual employers but merely agents of a corporate employer. The court, citing *Johnston*, held that penalty wages were not appropriate:

"ORS 652.150 authorizes the imposition of a penalty only if the employer *wilfully* fails to pay his employee's wages. An employer acts wilfully if, having the financial ability to pay wages which he knows he owes, fails to pay them. The statute was not intended to impose liability where the employer's refusal to pay wages is based upon a bona fide belief that he is not obligated to pay them."

*Lee*, 251 Or at 293 (emphasis in original).

The court reached a similar conclusion in *Hekker v. Sabre Construction Co.*, 265 Or 552, 510 P2d 347 (1973). The plaintiff was a salesman employed by the defendant. His compensation consisted of commissions minus deductions for expenses that the employer paid on his behalf. When the plaintiff quit, a dispute arose over whether, under the terms of the employment contract, the employer had correctly carried forward expenses from an earlier pay period. The court construed the contract in the plaintiff's favor and awarded him damages but it denied him penalty wages. Citing *Lee*, the court held that the employer's conduct was not willful:

"Plaintiff has not pointed to any evidence in this case which would require the trial court to find that defendant acted wilfully, as that term was defined in *Lee*. We have found none. For all that the record shows, defendant's failure to pay plaintiff his commissions was based on a bona fide belief that no commissions were due under the terms of the employment agreements."

265 Or at 561. *Hekker*, then, implies that an employer lacks knowledge, and therefore does not act willfully, if it has a good faith belief that one of the elements necessary to trigger the obligation to pay wages owed at termination is lacking.

The court returned to ORS 652.150 in *Sabin v. Willamette-Western Corp.*, 276 Or 1083, 557 P2d 1344 (1976). In that case, when the plaintiff's employment terminated, the employer owed him $500 in pay for unused vacation time. The employer, however, deducted from that amount an outstanding debt of $91.62 on the theory that the employer had the right to recoupment or set off. The court affirmed the trial

court's decision to award penalty damages. Citing *Johnston* and quoting the definition of "willful" from that case, the court held:

"Although we believe it to be a close question, we hold that there was sufficient evidence to support the finding by the trial judge that defendant's conduct was 'wilful' for the purposes of this statute * * *. [D]efendant * * * wrongfully undertook to deduct as a matter of 'set-off' or 'recoupment' the $91.62 from the wages due to [the plaintiff] for that work. * * *

"Although defendant may not have acted with 'malice or wrong,' or with 'perverseness or moral delinquency,' we believe that the trial court could reasonably infer from these facts that in making the deduction of $91.62 defendant did not make an 'unintentional miscalculation'; but 'knew what he was doing, intended to do what he was doing, and was a free agent' and that defendant was a 'careless employer,' so as to constitute a 'wilful' failure to pay the wages payable to plaintiff within the meaning of ORS 652.150, as construed by this court in [*Johnston*] * * *."

*Sabin*, 276 Or at 1093-94. The court, then, explicitly reaffirmed the existing definition of "willful" as "knowing," and concluded that the employer's "wrongful" action fit within that category because, although it was not driven by malice, neither was it an innocent error based on misinformation or lack of information. Action that is careless, however, can be "willful" or "knowing."

The Supreme Court has not developed or altered this definition of "willful." In its only case since *Sabin* construing the term, *Taylor v. Werner Enterprises, Inc.*, 329 Or 461, 988 P2d 384 (1999), the court—again citing *Johnston*—held that an employer acted willfully when it withheld a "bond" from an employee's wages until the company was satisfied that there were no claims against it. *Id.* at 463-64.

The Supreme Court cases, then, establish that an action is willful if it is fully knowing, intentional, and voluntary. Clearly, a malicious action or one taken in bad faith qualifies. Equally as clearly, an employer does not act willfully if it acts without fully knowing that the historical circumstances triggering the obligation have occurred (for

example, that the employee has quit) or if it acts based on an innocent miscalculation that is not careless.

■ A series of cases from this court provides additional guidance. In all of them except the most recent (*Young v. State of Oregon*, 195 Or App 31, 96 P3d 1239 (2004), *rev allowed*, 338 Or 57 (2005), discussed below, 197 Or App at 664), we held that an employer who failed fully to pay earned wages on termination acted willfully, despite the employer's good faith belief in the correctness of its action. And in all of the cases (except *Young*), the basis of the employer's belief was the same: Although acknowledging that the employee had earned wages and that the employment had terminated, the employer nonetheless knowingly and intentionally failed to pay the full amount owed, claiming some excuse external to the terms of ORS 652.140(1).

In *Schulstad v. Hudson Oil Company, Inc.*, 55 Or App 323, 328-29, 637 P2d 1334 (1981), *rev den*, 292 Or 825 (1982), for example, we imposed penalties on an employer that believed erroneously that it had authority to withhold from the employee's final paycheck an amount equal to a shortage in the cash receipts that the employee, a gas station manager, was supposed to have deposited in the employer's account. In subsequent cases, we imposed penalties on a logging contractor who deducted a debt from a cutter's final wages, *Garvin v. Timber Cutters, Inc.*, 61 Or App 497, 501, 658 P2d 1164 (1983); on an employer who believed in good faith that the employee had waived his right to timely payment of wages owed at termination, *Kling v. Exxon Corp.*, 74 Or App 399, 401-02, 703 P2d 1021 (1985); on an employer who deducted money from such wages pending the employee's return of the employer's equipment, *Emery v. Portland Typewriter & Office Machine*, 86 Or App 635, 638, 740 P2d 218 (1987); and on an employer who withheld insurance premiums from the employee's final check when, in fact, the employer had stopped paying the premiums to the insurance company, despite the fact that the employer claimed a good faith belief that it could reinstate the policy, *Wyatt*, 163 Or App at 531-32. Collectively, these cases stand for the proposition that, "[u]nder ORS chapter 652, 'self-help' is not available to an employer who seeks to offset wages that it owes to an employee. Defendant's remedy for any alleged misconduct

by plaintiff was through a separate action for damages." *Miller v. C. C. Meisel Co., Inc.*, 183 Or App 148, 160, 51 P3d 650 (2002). That rule applies even when the employer takes self-help actions in good faith.

In *Young*, our most recent case dealing with the definition of "willful," plaintiffs were state employees who contended, among other things, that the state violated ORS 652.150(1) by failing to pay them overtime as required by a statute that we had recently interpreted. 195 Or App at 34. Whether, in fact, the state owed overtime depended on that interpretation. We held that, with respect to those plaintiffs who accrued overtime before the statute was definitively interpreted, the employer's failure to pay was not willful because the employer was not fully aware of its obligation. *Id.* at 44. That outcome is not inconsistent with this court's earlier cases because the employer's failure to pay overtime did not result from its belief that it was entitled to an offset against wages that it knew it was obligated to pay; it resulted, instead, from the employer's reasonable lack of knowledge that it had an obligation in the first place. *Id.* at 46.

The cases, then, all apply the definition first stated in *Johnston*, 233 Or at 108: An employer acts willfully if it knows what it is doing, intends to do what it is doing, and is a free agent. However, *Johnston* itself explains that an employer that makes an "unintentional miscalculation" does not act willfully, 233 Or at 108, and both *Lee*, 251 Or at 293-94, and *Hekker*, 265 Or at 561, hold that an employer that withholds wages owed at termination under a bona fide belief that it has that authority does not act willfully. Those cases indicate that what an employer "knows" includes only those facts that it believes in good faith to be true. The Supreme Court has never overruled those cases, and, indeed, it continues to cite them. *See Taylor*, 329 Or at 469 (citing *Johnston*). Meanwhile, this court in *Schulstad*, 55 Or App at 328, observed that the Supreme Court "rejected" the "bona fide belief" standard in *Sabin*, and we have repeated that observation frequently. *E.g., Wyatt*, 163 Or App at 531 ("The Supreme Court * * * has construed the term as used in ORS 652.150 to require no showing of bad faith[.]"). And, as noted above, we have held that an employer whose failure to pay

wages owed at termination stems from a bona fide attempt at self-help nonetheless acts willfully. *Miller*, 183 Or App at 160.

This apparent confusion derives not from the cases themselves and their outcomes but from occasional reliance on imprecise and conclusory concepts such as knowledge, good faith, and malice. The cases themselves, as opposed to the courts' descriptions of them, reveal a consistent and coherent pattern: An employer willfully fails to pay wages owed at termination when it knows or reasonably should know all the facts that trigger the obligation under ORS 652.150, in particular, that the employment relationship has ended and that an identified employee has not received the wages he or she has earned, and nonetheless fails to pay the employee those wages. A reasonable lack of knowledge of those historical facts immunizes the employer from penalties.

Further, not any quantum of knowledge exposes the employer to penalties; the leading case, *Johnston*, refers to employers who "fail to compensate their employees although they are *fully* aware of their obligation to do so," 233 Or at 108 (emphasis added), and the most recent Supreme Court case cites that passage and echoes it: "The question * * * is whether * * * the employer[ ] had, or can be imputed to have had, a *level of awareness* of its obligation to pay plaintiff such that its failure to pay was 'willful.' " *Taylor*, 329 Or at 470 (emphasis added).

In contrast, an employer acts "willfully" when it has or should have the requisite knowledge at the requisite level but fails fully to pay the employee because it believes that some source of law external to ORS chapter 652—a personal debt, a term of the employment contract, or something similar—entitles the employer to reduce or eliminate the obligation. The reasonableness or good faith of that belief does not matter. *Miller*, 183 Or App at 160. Put another way, an employer need not pay wages owed at termination if it reasonably believes that the employee cannot make a *prima facie* case that the wages are due and owing. However, the employer does not escape the obligation merely because it believes that it has an affirmative defense or counterclaim

against the employee's claim—even if, in fact, such a defense or counterclaim exists. In such a case, the employer must pay the wages and then bring "a separate action for damages." *Id.*; *accord Young*, 195 Or App at 46.[7]

■ In the present case, defendant did not pay qualified union plaintiffs their severance pay until after the Ninth Circuit affirmed the arbitrator's order because, under the terms of the CBA, the obligation to pay the benefits arose only "in the event the company should decide to close permanently the Newberg mill," and defendant believed that the event had not occurred. Under the precepts we have deduced above, the question is: When did that belief become unreasonable? In other words, when did defendant achieve, or should defendant have achieved, the requisite "level of awareness of its obligation to pay" plaintiffs, in light of the language of the CBA? Plaintiffs contend that defendant had that level of awareness on November 10, the day of the sale to SP, or, at the latest, once the arbitrator's decision construing the term "close permanently" in plaintiffs' favor became final. Defendant contends that it could not achieve the requisite level of awareness until its appeal of the arbitrator's decision became final. The trial court agreed with defendant. We do not.

Initially, we conclude that a reasonable person could not know from the language of the CBA itself that the obligation to pay severance benefits arose on November 10. The event that occurred on that day—the transfer of ownership from defendant to SP—did not amount, in any obvious way, to a permanent closure. However, once the arbitrator rendered a final decision construing the CBA, defendant's level

---

[7] The dissent argues that, in *Johnston*, the Supreme Court described a standard under which good faith is irrelevant, yet an employer does not willfully fail to pay wages if the employer reasonably lacks "knowledge of the facts that create its obligation to pay earned wages." The court then strayed from that holding in *Hekker* and *Lee* but in *Sabin* returned to the *Johnston* standard under which good faith played no role. However, the dissent's reading of *Sabin* does not account for the fact that the court did not overrule *Hekker* and *Lee*, and, in fact, it explicitly left intact the holding from *Johnston* that nonpayment caused by an unintentional miscalculation did not expose an employer to penalty wages. *Johnston, Hekker,* and *Lee* all stand for the proposition that, in some circumstances, reasonable lack of knowledge insulates an employer from liability. The dissent, in other words, does not provide an interpretation of ORS 652.150 that satisfactorily reconciles all of the cases from this court and the Supreme Court.

of awareness reasonably should have changed. Parties to a CBA submit disputes to arbitration in order to determine definitively the meaning of their agreement. As the Ninth Circuit has noted:

> "Unlike the commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, the collective bargaining agreement is a skeletal, interstitial document * * *. The labor arbitrator is the person the parties designate to fill in the gaps; for the vast array of circumstances they have not considered or reduced to writing, the arbitrator will state the parties' bargain. He is 'the parties' officially designated "reader" of the contract, * * * their joint *alter ego* for the purpose of striking whatever supplementary bargain is necessary' to handle matters omitted from the agreement."

*Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173*, 886 F2d 1200, 1205 (9th Cir 1989), *cert den*, 495 US 946 (1990) (quoting Theodore J. St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel and Its Progeny*, 75 Mich L Rev 1137, 1140 (1977)).

■■ Further, judicial review of labor arbitrations is "very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Major League Baseball Players Ass'n v. Garvey*, 532 US 504, 509, 121 S Ct 1724, 149 L Ed 2d 740 (2001). The court will not overturn an arbitrator's decision even if it is convinced that the decision is erroneous as long as the arbitrator "is even arguably construing or applying the contract and acting within the scope of his authority." *Eastern Associated Coal Corp. v. United Mine Workers, Dist. 17*, 531 US 57, 62, 121 S Ct 462, 148 L Ed 2d 354 (2000) (citation omitted). In light of that hyper-deferential standard of review, defendant either knew or should have known with a high degree of certainty that its appeals would fail. We therefore conclude that defendant acquired the requisite information on which to base its decision to pay severance benefits when the arbitrator's decision requiring it to do so became final. That event occurred on April 30, 2001, more than 30 days before defendant finally paid severance benefits. We

therefore hold that the trial court erred in rejecting plaintiffs' claim that qualified union plaintiffs deserved a total of 30 days' penalty wages based on defendant's failure to pay those benefits.

## IV. CERTIFICATION OF SALARIED PLAINTIFFS

■ The parties dispute whether members of Subclass C, to whom we refer generically as "salaried" plaintiffs,[8] *see* 197 Or App at 652 n 1, were entitled to penalties because defendant unlawfully withheld medical insurance premiums from their last paychecks without authorization. A prior issue, however, is whether the trial court erred in certifying the class. Defendant contends that ORCP 32 K precludes certification. That rule provides:

> "A class action may not be maintained for the recovery of statutory minimum penalties for any class member as provided in ORS 646.638 or 15 USC 1640(a) or any other similar statute."

The statutes to which ORCP 32 K refers authorize private causes of action: ORS 646.638 authorizes a private civil action for damages under Oregon's Unlawful Trade Practices Act, and 15 USC section 1640(a) authorizes a private cause of action under the Federal Truth in Lending Act.

The parties' dispute concerns the meaning of the phrase "or any other similar statute." Defendant maintains that the trait shared by the two statutes, the possession of which by another statute makes that third statute "similar to" the named statutes, is that both provide a private right of action for statutory minimum penalties. Plaintiffs argue that the critical similarity is that both statutes are *consumer protection statutes* that provide private rights of action for recovery of statutory minimum penalties.

We agree with plaintiffs. Defendant's interpretation would be tenable if the statute simply read: "A class action

---

[8] The order certifying the class described it as "consisting of all former non-union Smurfit employees who were employed by SP * * * following SP's purchase of the Smurfit mill * * * that are seeking to recover penalties under ORS 652.615 for the alleged improper or unauthorized deduction of premiums for medical or any other insurance benefits."

may not be maintained for the recovery of statutory minimum penalties." However, this court interprets statutes "so as to give meaning to every word." *Due-Donohue v. Beal,* 191 Or App 98, 101, 80 P3d 529 (2003). We must therefore presume that ORS 646.638 and 15 USC section 1640(a) share a trait in addition to providing for statutory minimum penalties. That trait is that both statutes protect the consumer of goods or services. The statutes at issue in this case do not; rather, they protect the *providers* of services. The trial court did not err when it certified Subclass C.

## V. WITHHELD MEDICAL INSURANCE PREMIUMS

 Defendant made group medical insurance available to its employees and paid most of the premiums. The employees, however, were responsible for partial payment. To facilitate those payments, salaried plaintiffs signed a "Pre-Tax Enrollment/Change Form" authorizing defendant to withhold their contribution from their pay.

The parties agree that defendant stopped providing insurance coverage at the close of business on November 10, 1999, the day of the sale to SP. The parties also agree that defendant deducted 15 days' premiums from salaried plaintiffs' pay for the period of November 1 through November 15, thereby deducting for five days during which salaried plaintiffs worked for SP and not for defendants. Finally, the parties agree that, when salaried plaintiffs received their pay from SP for the period of November 11 to November 15, SP *also* deducted insurance premiums for the same period.

According to salaried plaintiffs, defendant's deductions violated ORS 652.610(3)(b). That statute prohibits an employer from deducting or withholding any part of an employee's wages unless the "deductions are authorized in writing by the employee [and] are for the employee's benefit[.]" An employer who violates that statute is subject to "a private cause of action * * * for actual damages or $200, whichever is greater." ORS 652.615. Plaintiffs also argue that the same deductions violated ORS 652.140 and warranted an award of penalty wages under ORS 652.150. The trial court denied plaintiffs' summary judgment motions on

both issues and granted defendant's. Plaintiffs assign error to those dispositions.

Resolution of this issue turns on whether the deduction was "authorized" and "for the employee's benefit" under ORS 652.610. We begin with the question of authorization. To the extent that salaried plaintiffs authorized a deduction, they did so in the "Pre-Tax Enrollment/Change Form," which provides, in part:

> "I understand that as an Active full-time employee, I automatically have [various forms of life and accidental injury insurance]. In addition to these coverages, I elect [medical, dental, and vision insurance] at a cost to me.
>
> "* * * * *
>
> "[B]y signing this enrollment form I authorize the Company to deduct the required contributions of the premium from my earnings on a before-tax basis[.]"

The form embodies a contract; we therefore begin by examining the text of the disputed provision within the context of the document as a whole. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997).

Both quoted provisions of the contract are relevant. The first contains the introductory phrase, "I understand that as an Active full-time employee, * * *." Although that phrase attaches most immediately to the statement in the first sentence regarding automatic coverage, it also bears on the next sentence's treatment of elected coverage, implying that the authorization does not extend beyond the period of active full-time employment. That implication is strengthened by the text of the second provision, which authorizes deductions only from "earnings." Plaintiffs did not receive any "earnings" from defendant after November 10; as of that date, there were no "earnings" from which an authorized deduction could be made, and it is implausible that the parties intended to enter into a contract under which defendant had authority to deduct premiums from one period's earnings in order to buy insurance for a period after the employment relationship ended.

Further, even if the deduction were authorized, it clearly was not "for the employee's benefit." Defendant knew

that it was not going to provide insurance for its employees after November 10; it so informed them in a letter before that date. When on November 15 it issued paychecks deducting insurance premiums for the period between November 10 and November 15, it could not reasonably be said to have made those deductions with the expectation that they would be used to benefit what were then former employees, and, in fact, the deductions were not so used. The fact that salaried plaintiffs received seamless coverage does not negate the fact that they paid for some of that coverage twice. Defendant's responsibility to avoid unlawful deductions was independent of SP's obligations.

Salaried plaintiffs also argue that defendant's excess withholding violated not only ORS 652.610(3)(a) but also ORS 652.150, because the withholding resulted in late payment of wages on termination. Thus, salaried plaintiffs contend, defendant must pay each of them not only $200 under ORS 652.615 but also 30 days of penalty wages.

Two cases suggest that plaintiffs are correct. In *Allen v. County of Jackson*, 169 Or App 116, 7 P3d 739 (2000), the plaintiffs argued that their employer's unauthorized deduction in violation of ORS 652.610(3) entitled them not only to the $200 penalty under ORS 652.615 but also to attorney fees under a separate statute, ORS 652.200(2). That latter statute allows attorney fees for "any action for the collection of wages[.]" *Allen* therefore presented two questions that are comparable to those presented here: First, does an employer who makes an unlawful deduction and does not remedy it within the statutory deadline for payment of wages subject itself to a claim for untimely payment of wages? Second, if so, is the employee entitled to claim both the $200 penalty and a separate penalty for untimely payment of wages? Our answer to those questions suggests that plaintiffs' argument is correct.

"Before the creation of what is now ORS 652.615, the way to recover an illegal deduction was to file a normal wage claim. Nothing in the legislature's action in creating a new, separate claim suggests that it intended to abolish the existing remedy; rather, the legislature added a new remedy to the existing one.

> "In short, * * * when an employer deducts amounts that are illegal under [ORS 652.615], the employee may file one or both of two different kinds of claims: (1) a regular wage claim under ORS 652.120 * * * or ORS 652.140 (concerning payment of wages at termination of employment); or (2) a specific claim for illegal deductions under ORS 652.615, which includes the minimum damage amount * * *."

*Id.* at 133-34.

Similarly, in *Taylor*, 329 Or at 471, the Supreme Court held that unauthorized withholding amounts to a failure to pay wages under ORS 652.140, that an employer who withholds without authorization violates both ORS 652.150 and ORS 652.610, and that the employee "is entitled to recover under ORS 652.150 and ORS 652.610(3)(c), together with penalties and attorney fees."

Neither case is precisely on point. *Allen* holds only that an employee may make two claims; it says nothing about achieving two recoveries. The employee in *Taylor* apparently made two separate claims, one for unpaid wages and one for unauthorized deductions, so the holding may mean only that the employee can recover on both and not that an employee could recover twice for the same claim. However, we conclude that, overall, the cases point to the conclusion that, by withholding pay without authorization, defendant incurs penalty wages under ORS 652.150 and the $200 penalty under ORS 652.615.

Further, the withholding was willful as we have defined that term: defendant knew that it was not providing insurance coverage after November 10 and it made the deductions intentionally. The trial court erred in denying plaintiffs' motion for summary judgment on this issue and in granting defendant's.

## VI. PREJUDGMENT INTEREST

Plaintiffs assign error to the trial court's denial of prejudgment interest on penalty wages awarded under ORS 652.150. They rely on ORS 82.010(1), which provides, in part:

> "The rate of interest for the following transactions * * * is nine percent per annum and is payable on:

"(a) All moneys after they become due; but open accounts bear interest from the date of the last item thereof."

Plaintiffs contend that the penalty wages are moneys due and that they therefore carry interest at the statutory rate. We agree.

■ ORS 82.010(1)(a) applies with full force to prejudgment interest; as the Supreme Court has announced, "[t]he allowance of prejudgment interest in an action is not a matter of judicial discretion, but is required by ORS 82.010(1)(a) on 'all moneys after they become due.'" *Highway Comm. v. DeLong Corp.*, 275 Or 351, 357 n 2, 551 P2d 102 (1976).

■■ That uncompromising language, however, has long been subject to a judicial gloss. Interpreting a predecessor statute to ORS 82.020(1)(a), the Supreme Court held that a party can receive prejudgment interest only when the " 'exact pecuniary amount was either *ascertained*, or *ascertainable* by simple computation, or by reference to generally recognized standards such as market price,' and where 'the time from which interest * * * must run * * * can be ascertained.' " *Public Market Co. v. Portland*, 171 Or 522, 625, 138 P2d 916 (1943) (quoting 1 *Sedgwick on Damages* § 300, 571 (9th ed 1916)) (emphasis in original). In determining whether the amount of the damages and starting date of the interest are ascertainable, we do not operate from the perspective of the parties during litigation but from an objective, post-judgment perspective. *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 339, 39 P3d 903, *rev den*, 334 Or 190 (2002).

Under these standards, the amount of damages at issue in this case, that is, the penalty wages, is readily ascertainable. Defendant's records show each plaintiff's regular rate of pay, and the amount of penalty wages follows from that rate as a matter of simple arithmetic. Further, the date from which the interest must run is also ascertainable. ORS 652.150 imposes a penalty on an employer who willfully fails to pay earned wages by the end of the first business day after termination. The penalty wage, which is a continuation of the earned wages, *Wyatt*, 163 Or App at 534, accrues daily until paid but for no more than 30 days. Thus, at the end of the second business day, the employer incurs a penalty (and the

employee obtains entitlement to damages) in the amount of one day's wages; at the end of the third business day, the employer incurs a penalty (and the employee becomes entitled to damages) in the amount of two days' wages; etc. Because ORS 652.150 imposes a 30-day maximum, if, as here, earned wages remain unpaid after 30 days, the penalty has fully accrued and interest begins to run at that point. Thus, in the present case, interest on the penalty for nonpayment of regular wages to all plaintiffs and to salaried plaintiffs for nonpayment of unlawfully withheld insurance premiums began to run after 30 days of willful nonpayment, that is, on December 11, 1999. Because, as we have decided, willful nonpayment of union employees' severance benefits did not begin until the arbitration order, interest on penalties associated with that nonpayment began 30 days thereafter.

Defendant, however, contends that there is another exception to the rule requiring prejudgment interest on ascertainable damage awards; such interest, according to defendant, is not justified when the damages are punitive as opposed to compensatory. In support of that contention, defendant relies on *Rexnord, Inc. v. Ferris*, 69 Or App 146, 150, 684 P2d 26 (1984), where we stated:

> "Although *Public Market Co. v. Portland* and its progeny provide that prejudgment interest on readily computable compensatory damages for breach of contract is proper, we find no authority extending that rule to punitive damages, which are not readily computable, and we decline to do so here."

Defendant misreads *Rexnord, Inc.* That case does not create a separate or new exception to the rule requiring interest on money as it becomes due; rather, it points out that punitive damages are one example of the existing exception because punitive damages are not readily computable. In the present case, although penalty wages are "a penalty for * * * nonpayment," they are not "punitive damages" of the kind that require a factfinder to speculate about how much money is necessary in order to achieve a deterrent effect on a tortfeasor. They are, in other words, ascertainable "by simple computation." *Public Market Co.*, 171 Or at 625.[9]

---

[9] Defendant correctly points out that, in most jurisdictions, courts do not allow prejudgment interest on punitive damages because the purpose of such interest is

## VII. ATTORNEY FEES

On cross-appeal, defendant assigns error to the trial court's award of attorney fees, arguing that the court failed to deduct from plaintiffs' request an adequate sum representing the time spent on claims on which plaintiffs did not prevail. Those claims involved defendant's deduction of medical insurance premiums. On appeal, we have reversed the trial court's determination of those claims; they are no longer claims on which plaintiffs did not prevail. Therefore, we reject defendant's assignment of error and remand to the trial court for further proceedings.

On appeal, judgment in favor of all plaintiffs on claim for penalty wages under ORS 652.150 modified to begin penalty period on November 11, 1999, and to include prejudgment interest; judgment against Subclass B on claim for penalty wages under ORS 652.150 based on unauthorized deductions of insurance premiums reversed; judgment against Subclass B on claim for penalty wages based on failure timely to pay severance pay reversed; judgment against Subclass C on claims for penalties under ORS 652.615 reversed; otherwise affirmed. Affirmed on cross-appeal.

**EDMONDS, P. J.,** concurring in part, and dissenting in part.

I agree with the majority opinion in all respects except for its conclusion about what is necessary to demonstrate that an employer acts "willfully" for purposes of a penalty wage claim under ORS 652.150(1). The majority holds that the qualified union plaintiffs' severance pay became due when the arbitrator determined defendant's liability for those wages under the collective bargaining agreement (CBA). Contrary to the majority's holding, I would hold that defendant's failure to pay severance wages was willful at the time that the sale of the mill was completed and defendant's employees were deemed terminated from their employment. I write separately to explain my disagreement with the

---

to compensate a party for his or her loss, while the purpose of punitive awards is to deter future bad conduct; to allow prejudgment interest on such punitive awards is to add windfall to windfall. We are not free to ignore ORS 82.010(1)(a) or the cases interpreting it in order to reach that result.

majority on that point. It appears that we disagree only because we understand differently the import of the Supreme Court's decision in *Sabin v. Willamette-Western Corp.*, 276 Or 1083, 557 P2d 1344 (1976), and the Court of Appeals cases applying it.[1]

A recital of the factual background about seniority rights in this case forms the backdrop as to why I reach a different conclusion than that of the majority. The CBA between defendant and its employees provided for severance pay, based on the number of years worked, if defendant decided "to close permanently the Newberg mill." The majority asserts that defendant could not reasonably know that its sale of the mill satisfied that condition and that it was liable for severance pay until the arbitrator's opinion became final. That conclusion does not recognize the effect of defendant's actions on employees in the context of the CBA. Although the mill did not physically stop producing paper after the transfer of ownership, *defendant* permanently closed *its* operation of the mill. The effect of the ownership change on plaintiff employees was, in significant respects, comparable to a plant closure immediately followed by a sale and reopening under new ownership, a circumstance that would have unquestionably entitled plaintiffs to severance pay.

The crucial effect of the sale, as it was structured in this case, is that defendant's employees lost their seniority rights in addition to suffering the effects on their retirement duties and pensions that the majority mentions. Seniority may be the most important right that an employee acquires under a CBA because it provides job choice and security that would not otherwise exist. From an employee's standpoint, the effect of the loss of seniority is identical to the loss of one job followed by the beginning of a new job because of the loss of all the job protection and other rights that the employee has built up over the years in the first job. Instead of having a contractual right to a desirable and secure job, an employee under the circumstances in this case could be subject to being assigned a less desirable or less secure job. Such changes could involve a change in job tasks as well as a change in

---

[1] The practical effect of our difference is the date upon which the interest on the penalty wages begins to run.

work shift. Thus, severance pay based on the length of time the employee has worked constitutes a contractual method under the CBA to provide recompense for that loss.

Based on those facts, the issue is whether defendant's failure to pay wages due to plaintiff employees at the time that the sale was complete was "willful" within the meaning of ORS 652.150(1). The statute provides that an employer is liable for penalty wages "if an employer willfully fails to pay any wages or compensation of any employee whose employment ceases[.]" The statute does not define "willfully," but the Supreme Court has interpreted it in several cases. The starting point for the analysis is *State ex rel Nilsen v. Johnston et ux*, 233 Or 103, 377 P2d 331 (1962), in which the Supreme Court established the meaning of the word "willful" that it and we have continued to follow up to this time.

In *Johnston,* the defendant argued that ORS 652.150 provided for an unconstitutional penalty because the statute was vague, arbitrary, and discriminatory. The Supreme Court noted that all of the defendant's arguments assumed

> "an unwary employer who has been trapped into subjecting himself to a penalty because he was unaware either that the employee's employment had been terminated or that the employee had actually done the amount of work which he claimed he had done. Throughout their brief the defendants proceed on the assumption that an employer who has made an honest and innocent error either in computing what he owes an employee or in assuming that his employee is still in his employ is unfairly penalized for making this error."

*Id.* at 107. The court responded by pointing out that an employer is not liable for penalty wages unless it acts willfully. It then quoted a definition of the term from a case on which it had previously relied:

> " 'In civil cases the word "wilful," as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing

done or omitted to be done was done or omitted intentionally. *It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent.'* "

*Id.* at 108 (quoting *Davis v. Morris*, 37 Cal App 2d 269, 99 P2d 345 (1940) (emphasis added)).

Under the definition of "willful" in *Johnston,* an employer that is excusably ignorant of the facts giving rise to the liability for unpaid earned wages is protected from liability for penalty wages. Said another way, "willfulness" for purposes of ORS 652.150 depends on the employer's knowledge of the facts that create its obligation to pay earned wages, its intent not to pay those wages, and its freedom to act as it did. The employer's good faith or lack thereof in failing to pay plays no role in that formulation. Rather, the obligation to pay is absolute once the employer acquires the knowledge of the facts creating its obligation. Thus, under the *Johnston* formulation, the statute contemplates that the employer must pay the wages when due. If an employer believes that its interpretation of the employment contract does not obligate it to pay the wages under the existing circumstances, or if it believes that it has a defense to the payment of wages or an offset against the amount owed, it must, under the statute, pay the wages in accordance with the time requirements of ORS 652.140 and assert its position separately in the appropriate forum or risk the imposition of penalty wages. The clear purpose of the penalty in ORS 652.150 is to encourage employers to pay earned wages at the time that they are earned and not to require employees to wait for the payment of their earned wage until the outcome of an unrelated dispute. Indeed, if an employer could delay payment of wages because it believed that it had some legal defense under an employment agreement, that purpose would be frustrated.

As the majority correctly points out, two later cases, *State ex rel Nilsen v. Lee*, 251 Or 284, 444 P2d 548 (1968), and *Hekker v. Sabre Construction Co.*, 265 Or 552, 510 P2d 347 (1973), got off track and appear to contradict *Johnston* in those respects by importing a good faith requirement into the meaning of the word "willfully" in the statute. However, the

Supreme Court "righted the ship" in *Sabin* and unambiguously returned to the *Johnston* formulation.

In *Sabin,* the defendant failed to pay the plaintiff's vacation pay when his employment terminated because it did not believe that it legally owed the vacation pay. The defendant relied on the provisions of a confidential memorandum, which it had never communicated to the plaintiff, that employees had no right to vacation pay on termination of employment. At the time of his termination, the plaintiff owed the defendant $91.62, a sum that he refused to pay until he received his vacation pay. When the defendant later rehired the plaintiff, it withheld the $91.62 that the plaintiff admittedly owed from his first paycheck. When the plaintiff's employment was terminated a second time, he still was not paid his vacation pay. The trial court awarded the plaintiff the unpaid vacation pay, less the $91.62 that the plaintiff admittedly owed. It also awarded him penalty wages, apparently based on the defendant's failure to pay the full amount owed at the time of the second termination.

On appeal, the defendant in *Sabin* argued, relying on *Johnston*, *Lee*, and *Hekker*, that ORS 652.150 does not penalize an employer whose refusal to pay is "based upon a bona fide belief that he is not obligated to pay[.]" *Sabin*, 276 Or at 1092. It contended that it had a good faith belief at the time of the plaintiff's termination that it was not legally obligated to pay the vacation wages. In response to the defendant's arguments, the Supreme Court first recognized that in *Lee* it had held that the plaintiff had the burden to prove that the employer acted willfully and that the statute was not intended to impose liability when the employer's refusal to pay was based on a bona fide belief that it is not obligated to pay. *Id.* at 1093. The court then explained that, "[i]n defining the term 'wilfully' for the purposes of this statute, *however*, we held in *State ex rel Nilsen v. Johnston et ux, supra* at 108, as follows[.]" *Id.* (emphasis added). The court then quoted its discussion about "willfulness" in *Johnston*. *Id*.

The *Sabin* court then turned to the facts of the case in light of the *Johnston* formulation and concluded:

> "Although defendant may not have acted with 'malice or wrong,' or with 'perverseness or moral delinquency,' we

believe that the trial court could reasonably infer from these facts that in making the deduction of $91.62 defendant did not make an 'unintentional miscalculation'; but 'knew what he was doing, intended to do what he was doing, and was a 'free agent' and that defendant was a 'careless employer,' so as to constitute a 'wilful failure to pay the wages payable to plaintiff within the meaning of ORS 652.150[.']"

*Id.* at 1094.

The key to understanding the holding in *Sabin* is to put the word "however," as italicized above, in its proper context. The word "however" can mean "nevertheless" or "in spite of,"[2] thus signaling a contrast with what went before. That is the sense in which the *Sabin* court used it—to contrast what it had said in *Lee* with what it was about to say regarding the definition of "willfully." Although the *Sabin* court expressly acknowledged that it had held in *Lee* that the statute was not intended to impose liability where the employer's refusal to pay wages was based on a good faith belief that the employer was not obligated, it implicitly repudiated that understanding in the following paragraph by the use of the word "however" in the lead sentence. In substance, the court returned to the definition of the word "willful" that it had used in *Johnston* in spite of what it had said in *Lee* and *Hekker*.[3]

That is the conclusion about the holding in *Sabin* that we reached in *Schulstad v. Hudson Oil Company, Inc.*, 55 Or App 323, 326, 328, 637 P2d 1334 (1981), *rev den*, 292 Or 825 (1982), in which we first considered the relationship between the *Johnston/Sabin* definition and the *Lee* and

---

[2] *Webster's Third New Int'l Dictionary* 1097 (unabridged ed 2002).

[3] The majority criticizes my understanding of *Sabin*, asserting that I do not account for the fact that *Sabin* continued to recognize that an unintentional miscalculation of wages does not give rise to a penalty under ORS 652.150. 197 Or App at 666 n 7. Of course, defendant does not contend in this case that it made an unintentional miscalculation of the wages that it thought were due and owing. Regardless, an unintentional miscalculation of wages could not satisfy the definition of "willfulness" under my understanding of the *Sabin* requirements because that term depends, in part, on the employer's knowledge of the facts that create the obligation to pay earned wages; in the case of an unintentional miscalculation, the required knowledge is absent because of the inadvertent nature of the calculation of the amount of wages due.

*Hekker* cases. In *Schulstad*, the employee brought an action to collect wages that he claimed were due him upon the termination of his employment. The employer counterclaimed, alleging that the employee owed it a sum of money under the terms of the employment contract.

On appeal, the defendant argued that a standard of good faith applied to ORS 652.150. We rejected that argument:

> "Although the Supreme Court has applied a standard of good faith in determining the wilfulness question on past occasions, that standard was rejected in [*Sabin*]. In that opinion, the court returned to the more restrictive definition of wilfulness in [*Johnston*]. * * *
>
> "* * * * *
>
> "The court in *Sabin* found that the defendant wilfully withheld wages from plaintiff, despite a showing of good faith. * * *
>
> "* * * * *
>
> "In the case at bar, the trial court found that defendant intentionally did not pay plaintiff, although it had the ability to do so. The evidence supports that finding. We conclude that defendant's action was 'wilful' and, therefore, defendant was subject to payment of penalty wages under ORS 652.150."

*Schulstad*, 55 Or App at 328-29. Since *Schulstad*, we have uniformly rejected arguments that an employer is exempt from penalty wages if it acted in good faith. *See, e.g., Vento v. Versatile Logic Systems Corp.*, 167 Or App 272, 277-78, 3 P3d 176 (2000); *Wyatt v. Body Imaging, P.C.*, 163 Or App 526, 531-32, 989 P2d 36 (1999), *rev den*, 330 Or 252 (2000). We have also emphasized in the above cases that an employer has an obligation to know what it owes its employees.[4]

---

[4] The Supreme Court has not expressly considered this issue since *Sabin*. However, my discussion is consistent with its most recent decision concerning penalty wages. In *Taylor v. Werner Enterprises, Inc.*, 329 Or 461, 988 P2d 384 (1999), the defendant asserted to the trial court that a separate entity was the actual employer, that Nebraska, rather than Oregon, law applied, and that its action in withholding wages was legal under Oregon law. There was no dispute that the defendant knew the historical facts. The Supreme Court decided the legal questions against the defendant and held, as a matter of law, that its failure to pay was willful under ORS 652.150(1), relying on the *Johnston* definition in doing so.

Finally, the majority seems to suggest that our recent cases are limited to situations in which the employer asserts what the majority describes as an "affirmative defense" to the obligation to pay earned wages. The majority is correct that many cases decided under the statute have involved situations in which the employer withheld earned wages that it owed in an attempt through self-help to collect money that the employee owed it. 197 Or App at 663-66. But those cases describe only a common circumstance where the provisions of the statute are implicated. The definition of "willfulness" in the statute does not depend on the reason advanced by the employer for the failure to pay earned wages, as shown by cases in which the employer asserted a good faith defense on other grounds. For instance, in *Schulstad*, the defendant argued that the plaintiff's work was not of sufficient quality to entitle him to earned wages. 55 Or App at 326. In *Taylor v. Werner Enterprises, Inc.*, 329 Or 461, 465, 988 P2d 384 (1999), the defendant's arguments included the argument that it was not legally the plaintiff's employer and that a different state's law applied. Finally, in *Vento*, the question was whether the defendant owed overtime wages to the plaintiff; other claims against the plaintiff played no role.

In our most recent decision concerning ORS 652.150, *Young v. State of Oregon*, 195 Or App 31, 96 P3d 1239 (2004), *rev allowed*, 338 Or 57 (2005), we reaffirmed our holding in *Schulstad* that a good faith belief is not a defense. We explained:

> "[W]e have held that, if an employer has actual knowledge that it has an obligation to pay overtime or if such knowledge reasonably can be imputed to the employer, a good faith belief that it has an excuse for not paying overtime will not allow the employer to escape imposition of a penalty under ORS 652.150(1). In *Schulstad* * * * this court considered the tension between [*Johnston*] and *Sabin*, on the one hand, and the Supreme Court's decisions in *Lee* and *Braddock* * * *, on the other. In *Lee* and *Braddock*, the Supreme Court held that a good faith belief by an employer that it did not owe an employee wages could excuse payment of a penalty. As noted above, in [*Johnston*], the court concluded that, despite an apparent good faith belief by the employer that it did not owe the full amount of wages

claimed by its employee under the statute, the employer knew that it owed wages to its employee and failed to pay them. The court held that the employer's failure to pay the wages was willful and subjected the employer to a penalty under the statute. In *Sabin*, the Supreme Court held that the defendant willfully withheld wages from the plaintiff employee despite a showing of good faith. *In* Schulstad, *we concluded that* [Johnston] *and* Sabin *were controlling.* We explained that, as found by the trial court, the defendant employer in *Schulstad* knew that it owed its employee wages at the time that the employee left his employment. We held that, although employer believed in good faith that it had an excuse for not paying the wages, its failure to pay them was intentional and the employee was entitled to penalty wages. *Id*. at 329."

195 Or App at 43 (emphasis added). We concluded that an employer is liable for penalties under ORS 652.150(1) either if it knew that the employees were entitled to the unpaid wages or if it could be charged with that knowledge. *Id*. at 47.

In *Young*, there was direct testimony that the employer did not know that the employees were entitled to overtime pay, and the trial court found that the entitlement to overtime pay was the result of an unintentional legislative drafting error. As a result of those facts, we held that the employees had failed to carry their burden of proving that the employer knew of their entitlement or that it was charged with that knowledge. 195 Or App at 47-48. In contrast, the obligation to pay severance compensation in this case comes from a negotiated agreement between defendant and plaintiffs' union. Moreover, there is no evidence of an unintentional drafting error in that agreement. Based on the evidence before us, defendant either knew or can properly be charged with knowledge of plaintiffs' right to severance compensation on November 10, the date that it terminated their employment. Plaintiffs' severance compensation became due at the end of the business day on November 11, *see* ORS 652.140(1), and under *Schulstad* and *Young*, they were entitled to penalty wages beginning on November 12, as provided in ORS 652.150(1).

Despite the above controlling precedents, the majority concludes that "defendant acquired the requisite information on which to base its decision to pay severance benefits

when the arbitrator's decision requiring it to do so became final." 197 Or App at 667. It holds therefore that the trial court erred in rejecting plaintiffs' claims that they were entitled to penalty wages from the date that the sale was complete and plaintiffs' employments were terminated. That holding is inconsistent with the holdings in *Sabin*, *Young*, and *Schulstad* for the reasons expressed above. Because the majority fails to interpret the statute as the legislature intended, and as both we and the Supreme Court have construed it, I dissent from that portion of the majority's opinion.