Argued and submitted December 19, 2007, affirmed September 10, petitioner's petition for reconsideration filed September 23 and respondent's response to petition for reconsideration filed September 29 allowed by opinion November 26, 2008
See 224 Or App 173, 197 P3d 60 (2008)

AMALGAMATED TRANSIT UNION
DIVISION LOCAL 757 (AFL-CIO),
*Respondent,*

*v.*

TRI-COUNTY METROPOLITAN TRANSPORTATION
DISTRICT OF OREGON,
*Petitioner.*

Employment Relations Board
UP6403; A133236

195 P3d 389

David Wilson argued the cause for petitioner. With him on the briefs was Bullard Smith Jernstedt Wilson.

Susan L. Stoner argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

In this unfair labor practice case, Tri-County Metropolitan Transportation District of Oregon (TriMet) contends that an arbitrator's award in favor of Amalgamated Transit Union Division Local 757 (ATU) conflicts with United States Department of Transportation (DOT) regulations governing the administration of drug-screening tests, and, consequently, is unenforceable under 49 USC section 5331(f)(1), the express preemption clause contained in the Omnibus Transportation Employee Testing Act of 1991 (Testing Act).

After TriMet discharged a bus driver (grievant) who had not produced sufficient urine for a drug-screening test, an arbitrator determined that the testing procedure was flawed and, thus, that the test should have been cancelled. Consequently, the arbitrator concluded that grievant's termination was without just and sufficient cause under the parties' collective bargaining agreement (CBA), and he ordered her reinstatement. TriMet complied with the order in most respects but contended that DOT regulations required grievant to be evaluated by a substance abuse professional (SAP) before she could resume her safety-sensitive duties as a bus driver. ATU filed a complaint with the Employment Relations Board (ERB) contending that TriMet's refusal to return grievant to her safety-sensitive position without a SAP evaluation was an unfair labor practice. *See* ORS 243.672(1)(g) ("It is an unfair labor practice for a public employer * * * [to refuse] to accept the terms of an arbitration award, where previously the parties have agreed to accept arbitration awards as final and binding upon them."). ERB concluded that TriMet had violated ORS 243.672(1)(g) by refusing to implement the aspect of the arbitration award exempting grievant from a SAP evaluation.

TriMet now seeks judicial review, arguing, among other things, that ERB erred in concluding that it was not required to review the merits of the arbitration order to determine whether the arbitrator correctly interpreted and applied DOT regulations; that ERB erred in concluding that the arbitrator did not violate DOT regulations by overturning the conclusion of a medical review officer (MRO) that there

was no valid medical explanation for grievant's failure to produce a sufficient urine specimen; and that any errors in the testing procedure did not affect grievant's right to a fair and accurate test.

We review orders of ERB for legal error, ORS 183.482(8)(a), and substantial evidence, ORS 183.482(8)(c). We conclude that, in light of the federal preemption provision, ERB erred in determining that it was not required to review the merits of the arbitration award. However, we agree with ERB that the arbitrator correctly ruled that the testing procedure did not comply with DOT regulations. Finally, we conclude that TriMet failed to preserve for review its contention that the flaws in the testing procedure did not compel cancellation of the test. Accordingly, we conclude that ERB did not err in determining that 49 USC section 5331 does not preempt enforcement of the arbitration order and, consequently, that TriMet committed an unfair labor practice by refusing to fully implement the award. For those reasons, we affirm ERB's order.

Before we recount the facts of this case in greater detail, an overview of the regulations that governed drug testing at the time that grievant was required to submit to the test at issue in this case is helpful.[1] The Testing Act requires that public transportation agencies that receive federal funds, such as TriMet, comply with DOT regulations requiring random drug testing of all its employees who perform safety-sensitive duties. 49 USC § 5331(b)(1)(A). Under the applicable regulations, employees selected for random testing were required to provide a urine specimen to a designated "collection site person," 49 CFR § 40.25(f) (2000), who shipped the specimen to a laboratory for testing, 49 CFR §

---

[1] This case is complicated to a degree by the fact that, in 2001, after the drug test at issue here but before the arbitration, DOT substantially revised 49 CFR part 40, the regulations governing drug and alcohol testing procedures. Many of the regulations that applied when the test at issue here took place remain substantively in effect but have been renumbered and reworded; others have been amended substantively. For present purposes, we refer to the version of the regulations in effect at the time of the test. *See Brown v. Georgetown University Hospital*, 488 US 204, 208-09, 109 S Ct 468, 102 L Ed 2d 493 (1988) (administrative regulations generally do not have retroactive effect). Later in this opinion, reference to the revised version will become necessary.

40.25(h) (2000). After testing the specimen, the laboratory reported the results to an MRO,[2] 49 CFR § 40.29(g) (2000), who reviewed and verified the results and, in turn, notified the employer, 49 CFR § 40.33 (2000).

If an employee who submitted to drug testing was unable to produce a sufficient urine specimen for testing, the collector was required to follow a "shy-bladder" protocol. 49 CFR § 40.25(f)(10)(iv)(A)(2)-(3) (2000). That protocol required the collector to "direct the individual to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a new urine specimen, whichever occurs first." 49 CFR § 40.25(f)(10)(iv)(A)(2) (2000). If the employee had "not provided a sufficient specimen within three hours of the first unsuccessful attempt to provide the specimen, the collection site person [was required to] discontinue the collection and notify the employer." 49 CFR § 40.25(f)(10)(iv)(A)(3) (2000). The employer then directed the employee "to obtain, as soon as possible after the attempted provision of urine, an evaluation from a licensed physician who [was] acceptable to the employer concerning the employee's ability to provide an adequate amount of urine." 49 CFR § 40.25(f)(10)(iv)(B) (2000). The physician reported the results of the evaluation to the MRO, who, in turn, reported his or her conclusions to the employer. *Id.*

Under the regulations governing an employer's responsibilities under the testing program, *see generally* 49 CFR part 653, a failure to provide a urine specimen without a medical explanation was deemed a refusal to submit to testing, 49 CFR § 653.7 (2000), and, for purposes of the employer's ability to retain the employee in a safety-sensitive position, a refusal to take a drug test constituted a "verified

---

[2] 49 CFR section 40.3 (2000) defines "medical review officer" as follows:

"A licensed physician (medical doctor or doctor of osteopathy) responsible for receiving laboratory results generated by an employer's drug testing program who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual's confirmed positive test result together with his or her medical history and any other relevant biomedical information."

positive drug test result," 49 CFR §§ 653.25(g), 653.35, 653.37 (2000).

An employee who tested positive or refused to be tested could not return to safety-sensitive duties unless he or she submitted to an evaluation by a SAP and followed any education or treatment recommendations made by the SAP. 49 CFR § 653.37 (2000).

49 USC section 5331(f)(1) expressly preempts any state law that conflicts with regulations promulgated by DOT pursuant to the Testing Act. It provides that no state or local government may "prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this section." DOT's implementing regulations also "preempt[ ] any state or local law, rule, regulation, or order to the extent that * * * [c]ompliance with both the State or local requirement and any requirement in [49 CFR part 653] is not possible[ ] or * * * [c]ompliance with the State or local requirement is an obstacle to the accomplishment and execution of any requirement in [49 CFR part 653]." 49 CFR § 653.9 (2000); *see also Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 US 707, 713, 105 S Ct 2371, 85 L Ed 2d 714 (1985) (noting that the Court has "held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes").

With that background in mind, we turn to the facts of this case, which are undisputed.[3] TriMet is a public transportation district that provides bus and light rail public transportation throughout the Portland metropolitan area. ATU represents certain TriMet employees, including grievant. Grievant was selected for a random drug-screening test in June 1999, but she failed to report to the drug tester's collection site. Consequently, she was deemed to have refused the test under DOT regulations and TriMet policy. Before she

_____

[3] In one assignment of error, TriMet asserts that ERB erroneously concluded that TriMet had conceded that ERB should accept the arbitrator's findings of fact. However, TriMet makes no argument in support of that assignment, and it points to no factual finding of the arbitrator with which it disagrees. Accordingly, we conclude that the facts are not in dispute, and we reject TriMet's assignment of error without further discussion.

could return to work, grievant was required to be evaluated by a SAP, who concluded that she should be randomly tested for a period of five years. Under TriMet policy, a positive or refused test during that period would be grounds for immediate termination.

In August 2000, a little more than a year after her first refused test, grievant was again selected for a random drug test. Grievant first attempted to produce a urine specimen at 5:55 a.m. She was unable to produce enough urine (45 milliliters) for testing, so the specimen collector initiated the "shy bladder" protocol. In an effort to stimulate urine production, grievant consumed a total of 36 ounces of water. At 6:55 a.m. and at 8:45 a.m., she again attempted to produce a specimen, but the amount was insufficient both times. Grievant did not thereafter request, and was not given, another opportunity to produce a sufficient specimen. At 8:50 a.m., two hours and 55 minutes after grievant's first attempt, the collector terminated the test and notified TriMet that grievant had not provided an adequate specimen.

TriMet sent grievant to Dr. Harris, who performed testing to determine whether she suffered from a medical condition that could have precluded her from providing an adequate amount of urine. Harris, who is not a urologist, concluded that grievant did not suffer from such a medical condition. Harris's conclusion was then reviewed by an MRO, who told TriMet that grievant had refused to take the drug test.

Based on the conclusion that she had refused a second drug test, TriMet terminated grievant's employment. ATU grieved her discharge pursuant to its collective bargaining agreement with TriMet, contending that her termination was without "just and sufficient cause" and thus violated the CBA.

In January 2001, five months after grievant was discharged, TriMet agreed to send her to a urologist, Dr. Lemmer, to determine whether she suffered from a condition that would reasonably explain her inability to provide a sufficient sample of urine. Lemmer examined grievant and conducted a series of tests before concluding that grievant suffered from "female stress urinary incontinence." He

opined that an inability to produce urine could be explained by voluntary dehydration, a strategy often employed by incontinent individuals to prevent leakage. Lemmer could give no opinion about grievant's condition in August 2000, but he noted that individuals with female stress urinary incontinence often suffer without being diagnosed for long periods of time.

ATU and TriMet arbitrated the grievance in September 2003. The arbitrator concluded that the procedures that TriMet used did not strictly comply with the governing DOT regulations:

"The face of the official testing record indicates that the grievant was not afforded the full three hour time period required by 49 CFR Section 40.25(f)[(10)](iv)(A)(2) and (3). Since the determination that the grievant tested positive for drugs is conditioned upon strict compliance with the testing protocol, the three hour time period is a due process requirement that must be met. * * * The grievant was not given a full three hour period of time to provide an adequate sample of urine.

"* * * [The] grievant drank 36 ounces of water[, but t]he requirement of 46 CFR Section 40.25 (f)[(10)](iv)(A)(2) is that 'the collection site person shall direct the individual to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours[.]' Since the grievant had only consumed 36 ounces of fluid after two hours and fifty five minutes, her consumption of water was not reasonably distributed through the testing period. One does not need a medical degree to recognize that it takes some amount of time for the body to process fluids. In order for the grievant to have consumed fluids of up to 40 ounces 'reasonably distributed' in a three hour period, all 40 ounces would had to have been consumed with sufficient time for the body to process the fluid before the test ended. Implicit in the procedure * * * is the recognition that an additional four ounces of fluid consumed with only five minutes remaining in the testing period was not reasonably calculated to pass through the grievant's system, during the remaining five minutes.

"* * * [G]rievant was not afforded all of the due process protections available to her under 49 CFR Section 40.25(f)[(10)](iv)(A)."

In addition to concluding that the administration of the collection procedure violated the governing regulations, the arbitrator also determined that grievant was denied the requisite due process protections during the subsequent medical examination:

"She was not informed of the requisite expertise of the physician she needed to perform her examination. * * * She was not informed of the scope of testing that was available to evaluate her condition. * * * She was not given an opportunity to have any input into the selection of the physician.

"* * * * *

"* * * Clearly, if an employee informs those who conduct the test and an examining physician that she believes dehydration caused her inability to provide an adequate sample, the medical examination must include elements designed to determine whether there is evidence to support the assertion of dehydration. The examining physician was not called as a witness in this arbitration and the medical report drafted by the examining physician contained no statement addressing either dehydration or female stress incontinence. There is no evidence that the medical examination given to grievant * * * was reasonably calculated to detect whether grievant suffered from the same medical condition [in August 2000] that was detected in [January 2001].

"* * * * *

"* * * [In addition, t]he due process protections found at 49 CFR Section 40.25(f)[(10)](iv)(B)(1) and (2) require the physician to disclose the factual basis for his or her medical conclusion."

Having found that the procedures did not strictly comply with the governing regulations, the arbitrator concluded that TriMet lacked just and sufficient cause to terminate her employment. In light of that conclusion, the arbitrator ruled that TriMet was required to reinstate grievant with full back pay and restoration of her seniority and benefits.[4]

---

[4] The arbitrator also determined that grievant's return-to-work agreement after the first refused test would continue, and he did not preclude TriMet from requiring grievant to pass a drug-screening test before being returned to work.

After the arbitrator issued his decision, TriMet returned grievant to work, but, after consulting with DOT, it asserted that federal regulations prohibited restoring her to a safety-sensitive position without first having her evaluated by a SAP.[5] ATU asked the arbitrator, who had retained jurisdiction, to order that grievant be returned to her safety-sensitive position without a SAP evaluation, arguing that, because she had not violated DOT drug and alcohol policies, TriMet had no legal basis to require grievant to submit to an evaluation before reinstating her. The arbitrator agreed with ATU and issued a clarification stating that the irregularities in the testing procedure were such that the test should have been cancelled rather than deemed refused. Accordingly, the arbitrator prohibited TriMet from referring grievant for a SAP evaluation.

TriMet refused to comply with the arbitrator's order. ATU filed a complaint with ERB, alleging that TriMet engaged in an unfair labor practice by refusing to reinstate grievant as required by the arbitration award. *See* ORS 243.672(1)(g). TriMet did not challenge the arbitrator's order to reinstate grievant with back pay, seniority, and benefits, but it reiterated its contention that DOT regulations mandated that grievant undergo a SAP evaluation and comply with any recommended treatment program before returning to work in a safety-sensitive position. TriMet argued that 49 USC section 5331(f)(1) prevented it from enforcing the arbitrator's award because the award conflicted with DOT regulations. Among other things, TriMet argued that the arbitrator impermissibly overturned the MRO's determination that there was no medical explanation for grievant's failure to produce a sufficient urine specimen.

In response, ATU argued that the CBA provided for final and binding arbitration as the exclusive means of resolving disputes over employees' terminations and that

---

[5] 49 CFR section 40.285(1)(a) (2002) explains when a SAP evaluation is required:

"As an employee, when you have violated DOT drug and alcohol regulations, you cannot again perform any DOT safety-sensitive duties for any employer until and unless you complete the SAP evaluation, referral, and education/treatment process set forth in this subpart and in applicable DOT agency regulations. The first step in this process is a SAP evaluation."

nothing in 49 USC section 5331(f)(1) prevented the arbitrator from considering whether the testing procedures employed by TriMet comported with due process. In a recommended ruling, a hearing officer concluded that, because an arbitrator's mistake of law will not vitiate an arbitration award, TriMet violated ORS 243.672(1)(g) when it refused to follow the arbitrator's order to reinstate grievant to her safety-sensitive position without first requiring a SAP evaluation.

ERB agreed with the hearing officer, concluding that it could not review the legal reasoning underlying the arbitrator's order and that, on its face,

> "[t]he arbitrator's order * * * does not conflict with federal regulations. The arbitrator ordered TriMet to reinstate the employee without requiring her to first submit to a SAP evaluation. The administrative regulations require a SAP evaluation only for employees who have a positive result on a drug test. The arbitrator found that the grievant did not have a positive result on her drug test. It does not violate federal regulations to restore an employee to a bus driver position without a SAP evaluation when she did not have a positive result on a drug test."

Although ERB concluded that it was not required to review the merits of the arbitrator's order, it nonetheless stated that, even if it were required to do so, it would reach the same conclusion. It explained that conclusion by actually analyzing the merits of the order. ERB stated that it agreed with the arbitrator that TriMet had failed to follow the "shy bladder" protocol. Because of that, ERB reasoned, the MRO should not have reviewed the "results" of the test, and, consequently, the arbitrator did not overturn the MRO's medical judgment that the test should be treated as a verified positive. ERB ordered TriMet to reinstate grievant without her submitting to a SAP evaluation. TriMet sought judicial review in this court.

On review, TriMet again contends that 49 USC section 5331 preempts any state or local "law, regulation, standard, or order"—including ERB's order enforcing the arbitration award—that would prevent it from complying with DOT regulations. In TriMet's view, the arbitrator's conclusion that grievant's test should have been cancelled instead of being

deemed to have been refused was inconsistent with DOT regulations that permitted only the MRO to make that determination. TriMet further argues that the arbitrator's conclusion that the administration of the "shy bladder" protocol did not comport with due process was inconsistent with the regulations for numerous reasons.[6] Finally, TriMet argues that the arbitrator's order is inconsistent with public policy. ATU responds by arguing that 49 USC section 5331 "requires the same scope of review as that required by Oregon law," so that an arbitration award may be reversed only if it is contrary to public policy. In ATU's view, the sole effect of section 5331(f)(1) is that it requires Oregon courts to consider whether implementation of an arbitration award would be contrary to public policy as expressed in DOT regulations, in addition to public policy articulated in judicial decisions or statutes. In other words, ATU contends that section 5331(f)(1) provides no reason to depart from the general principle of forbidding judicial review of the merits of a labor arbitrator's findings of facts or analysis of the law. ATU also argues that, even if we review the merits of the arbitrator's order, the arbitrator correctly analyzed the DOT regulations and concluded that they did not require grievant to submit to a SAP evaluation.

The parties' complex arguments about the intersection of the preemptive effect of DOT regulations with limited judicial review of arbitration orders reduce to this: What is the proper scope of review of a labor arbitration order involving DOT drug and alcohol testing regulations? Under that

---

[6] TriMet also assigns error to ERB's exclusion from evidence the record of the arbitration, medical testimony and exhibits that TriMet offered before the ERB hearing, and an opinion letter from DOT's counsel. Although ERB declined to take the letter from counsel into evidence, it did consider counsel's statements as legal argument bearing on the meaning of the regulations at issue. We conclude that there was no evidentiary error in that respect. We need not decide whether ERB erred in refusing to admit the medical testimony and exhibits that TriMet offered, because we conclude that they are not material to the issues that are dispositive in this case. Finally, with respect to the arbitration record, ERB declined to admit it into evidence because it concluded that it was not required to review the merits of the arbitrator's order. As we explain below, that conclusion was erroneous. However, in spite of its conclusion, ERB did in fact review the merits of the arbitrator's order, and, in doing so, it necessarily considered the arbitration record. Thus, we deem the arbitration record to have been admitted into evidence and treat ERB's purported refusal to admit it harmless error.

scope of review, is the arbitrator's order that TriMet must reinstate grievant without her first submitting to a SAP evaluation enforceable?

■■ Generally, the scope of judicial review of labor arbitration awards is very limited. Courts do not review the arbitrator's reasoning, despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Wilson v. Smurfit Newsprint Corp.*, 197 Or App 648, 667, 107 P3d 61 (2005) (citing *Major League Baseball Players Ass'n v. Garvey*, 532 US 504, 509, 121 S Ct 1724, 149 L Ed 2d 740 (2001)). In the narrow and specific context of drug-screening tests of transit employees in safety-sensitive positions, however, the ordinary scope of judicial review of labor arbitration awards runs afoul of the preemption clause in the federal Testing Act. 49 USC section 5331(f)(1) prohibits enforcement of an arbitration order if it is inconsistent with DOT regulations. The plain wording of the clause demonstrates that Congress intended to broadly preempt state and local governments from "prescrib[ing], issu[ing], or continu[ing] in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed" by DOT. The implementing regulations also "preempt[ ] any [s]tate or local law, rule, regulation, or order to the extent that * * * [c]ompliance with both the State or local requirement and any requirement in this part is not possible[ ] or * * * [c]ompliance with the State or local requirement is an obstacle to the accomplishment and execution of any requirement in this part." 49 CFR § 653.9 (2000).

Because 49 USC section 5331(f)(1) and the implementing regulations prohibit an arm of state or local government, such as ERB, from enforcing an order that would prevent TriMet from complying with DOT regulations, ERB was required to consider the merits of the arbitrator's order. If TriMet cannot abide by the arbitration order without violating DOT regulations, the order is preempted, and ERB may not enforce it. The only way to determine whether TriMet can abide by the order without violating DOT regulations is to determine whether the arbitrator correctly construed and applied the regulations: If the arbitrator applied the regulations incorrectly, cancellation of grievant's drug test was

improper, and TriMet would violate DOT regulations by obeying the arbitrator's order to reinstate her without submitting to a SAP evaluation. On the other hand, if the arbitrator applied the regulations correctly, cancellation of the test was proper, and the order is not preempted. In short, to the extent that ERB believed that it was not required to review the merits of the arbitrator's order, ERB erred.

As noted, in spite of its conclusion as to the scope of its review, ERB did in fact review the arbitrator's reasoning and again concluded that the order is not in conflict with DOT regulations and is thus enforceable. Accordingly, ERB's error as to the scope of its review does not require that we remand for reconsideration. Rather, we review ERB's conclusion with respect to the merits of the arbitrator's order. To determine whether compliance with the arbitrator's order would be inconsistent with the governing DOT regulations— and thus whether the order is preempted—we must determine whether the arbitrator was correct in concluding that grievant's drug test should have been cancelled rather than deemed refused.

■ We begin with the arbitrator's conclusion that the test should be cancelled because the collection site person ended the process before three hours had elapsed. TriMet argues that the collector was not required to give grievant a full three hours, contending that the provision in 49 CFR section 40.25(f)(10)(iv)(A)(2) (2000) for a period of "up to three hours" establishes only the maximum amount of time that the collector must allow, not the minimum. In other words, according to TriMet, a period of less than three hours is permissible.

We disagree. 49 CFR section 40.25(f)(10)(iv)(A)(2) (2000) provides that, if, on the first attempt, the employee has not provided the required quantity of urine, "the collection site person shall direct the individual to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a new urine specimen, whichever occurs first." Paragraph (A)(3) provides, "If the employee has not provided a sufficient specimen within three hours of the first unsuccessful attempt to

provide the specimen, the collection site person shall discontinue the collection and notify the employer." Assuming that TriMet is correct that "up to three hours" does not establish a minimum amount of time, the phrase still does not authorize an employer to give an employee less than three hours to attempt to provide a specimen. Paragraph (A)(2), in which the phrase "up to three hours" appears, establishes the period of time in which the employee may drink fluid. Paragraph (A)(3) establishes when the collector should discontinue the collection, and it does not include the phrase "up to three hours." Rather, it provides that the employee must provide a specimen "within three hours" and that, if the employee fails to do so, the collection site person must then discontinue the collection.

TriMet asserts that DOT has construed paragraph (A)(2) as providing only for the maximum period of time that must be allowed for specimen collection. It relies on a letter from the Deputy Assistant General Counsel for DOT's Office of Drug and Alcohol Policy Compliance. In the letter, counsel addressed the phrases "up to 40 ounces of fluid" and "up to three hours." TriMet relies in particular on his statement, "The 40 ounces and three hours, in other words, are maximums, not minimums." But in the immediately preceding sentence, counsel stated, "The plain meaning of the words is that the employee may drink any amount of fluids, not to exceed 40 ounces, over any period of time, not to exceed three hours." Later in the letter, counsel explained, "There is no inconsistency with this provision of the regulation if the *employee* chooses to try to provide a specimen after one hour (or two hours and fifty minutes, for that matter), fails to provide a sufficient specimen, and the *employee* then chooses to terminate the procedure." (Emphasis added.) Thus, the regulation does not establish a "minimum" in the sense that a collector may not *require* an employee to drink 40 ounces of fluid or remain at the collection site for three hours, but, as even DOT's counsel acknowledged, the choice to terminate the procedure sooner is the employee's alone to make. It follows that, even if the phrase "up to three hours" applied to the time for collection, it would mean that the employee may, if he or she needs to, take as much as three hours to provide a

specimen, not that the collector may allow less than three hours.

That conclusion is consistent with DOT's official statement in the Federal Register explaining its decision in 1996 to increase the collection period for "shy bladder" situations from two hours to three:

> "The rule contemplates the following sequence of events. For example, the employee arrives at the collection site at 1:45 p.m. The employee and collection site person begin the testing process by filling out the initial portions of the chain of custody and control form. The collection site person directs the employee to go to the bathroom and provide a specimen (whether or not the employee claims to be 'ready' to do so). The employee returns the collection container to the collection site person.

> "It is now 2 p.m. If the employee asserts that he or she has tried and failed to produce a specimen or the specimen is short of the required amount of urine, the employee will have until 5 p.m. (i.e., three hours from the time the employee returned the initial collection container to the collection site person) to drink up to 40 ounces of fluid and make another attempt to provide a sufficient specimen."

61 Fed Reg 37693, 37696 (July 19, 1996).

TriMet points out that DOT's counsel stated in his letter that the arbitrator's conclusion in this case was inconsistent with the DOT regulations. In light of counsel's explanation of the provisions at issue and DOT's statement in the Federal Register, it appears that counsel misunderstood the factual underpinning of the arbitrator's conclusion—namely, that it was the collector, not grievant, who terminated the test early.

In short, we conclude that the arbitrator correctly construed the DOT regulation governing the amount of time allotted for the "shy bladder" protocol. The question remains whether the failure to allow three hours required cancellation of the test. TriMet argues that the arbitrator was precluded from cancelling the test by two regulations that took effect after the test took place but more than two years before the arbitration, 49 CFR section 149(c) (2001) and 49 CFR section 40.209(b) (2001), the substance of which we set out

below. ATU responds that we should apply only the version of the regulations in effect at the time of grievant's drug test.

The parties arguments raise the question whether the regulations promulgated in 2001 apply retroactively, given the timing of the drug test at issue. We conclude, however, that we need not answer that question, for the reasons explained below. We address each regulation in turn, beginning with 40 CFR section 40.149(c) (2001).

■ TriMet relies on 49 CFR section 40.149(c) (2001) in support of its argument that, in concluding that grievant's drug test should have been cancelled, the arbitrator impermissibly overturned the medical judgment of the MRO. That regulation, which is addressed to the MRO, provides:

> "You are the only person permitted to change a verified test result, such as a verified positive test result or a determination that an individual has refused to test because of adulteration or substitution. This is because, as the MRO, you have the sole authority under this part to make medical determinations leading to a verified test (e.g., a determination that there was or was not a legitimate medical explanation for a laboratory test result). For example, an arbitrator is not permitted to overturn the medical judgment of the MRO that the employee failed to present a legitimate medical explanation for a positive, adulterated, or substituted test result of his or her specimen."[7]

We need not decide whether that regulation applies, because, at least with respect to validity of the specimen collection procedure, we conclude that the arbitrator did not overturn a medical judgment of the MRO.[8]

---

[7] In drafting the 2001 revision of 49 CFR part 40, DOT sought to implement the Clinton administration's "plain language" policy. DOT described the revised regulations as using "a question-answer format, with language specifically directing particular parties to take particular actions (*e.g.*, 'As an employer, you must * * *')." 65 Fed Reg 79462 (Dec 19, 2000). According to DOT, it "received a plain language award, known as the 'No Gobbledygook Award,' from Vice President Gore's National Partnership for Reinventing Government in recognition of the improved clarity of the regulation." *Id.*

[8] The arbitrator's conclusion concerning the collection procedure provides a sufficient basis for affirming ERB's order, so we need not consider whether the arbitrator overturned medical judgments with respect to the MRO's verification of Harris's evaluation.

■■ TriMet takes the position that, by declaring the test cancelled, the arbitrator "overturned" the MRO's medical judgment. We disagree. Section 40.149(c) (2001) does not provide that, once an MRO has verified a test result, the test may never be declared cancelled by an arbitrator. Although the regulation provides that an arbitrator is not permitted to overturn medical judgments by an MRO, it does not preclude an arbitrator from cancelling a verified test on other grounds. Although cancelling a test effectively nullifies the MRO's determination, that is permissible if the cancellation is based on a nonmedical determination of error. An arbitrator "overturns" the MRO's medical judgment only if the arbitrator substitutes his or her own substantive judgment for that of the MRO.

DOT has explained its intent in enacting the regulation:

"The Department makes the MRO the key person in determining the disposition of a non-negative laboratory result. The MRO is directed to bring his or her professional training and experience to bear on questions such as whether there is a legitimate medical explanation for a positive, adulterated, or substituted test result. The Department believes strongly that the medical judgment of the MRO on these questions should not be overturned by arbitrators, employers, or other participants in the drug testing program. Consequently, we have clarified paragraph (c) to emphasize that MROs have sole authority to make medical judgments about drug test results and that arbitrators and other participants in the system do not have authority to overturn these judgments.

"This is not to say that an arbitrator is precluded from requiring a test result to be canceled on other grounds (e.g., a fatal flaw in the chain of custody, the failure of the MRO to provide an opportunity for the employee to present evidence of an alleged legitimate medical explanation, the denial of the right to have a split specimen tested). But an arbitrator could not decide, in the face of an MRO's judgment that there was not a legitimate medical explanation, that the employee had presented a legitimate medical explanation. This rule is intended to prevent such a substitution of judgment *about a matter committed to the expertise of the MRO*."

66 Fed Reg 41944, 41946-7 (Aug 9, 2001) (emphasis added).

The arbitrator concluded that the collection procedure was defective because, among other things, the collector did not allow grievant the full three hours or the full 40 ounces of fluid. Nothing in the DOT regulations in effect at the time of the collection required—or even authorized—the MRO to review the collection procedure. Indeed, 49 CFR section 40.25(f)(iv)(A)(3) (2000) provided that, if the employee did not provide a sufficient specimen within three hours, the collector was required to "discontinue the collection and notify the *employer*." (Emphasis added.) The only role the MRO played was to review the conclusion of the examining physician assigned to determine whether a medical condition could have precluded the employee from providing an adequate specimen. 49 CFR § 40.25(f)(iv)(B)(1)-(2) (2000). Thus, the validity of the collection procedure was not a "matter committed to the expertise of the MRO."

The MRO's determination that grievant had refused to take the test was based on his conclusion that there was no valid medical explanation for her failure to produce a sufficient urine specimen. The arbitrator did not substitute his own judgment for that conclusion. Rather, he concluded that, in light of the procedural errors, the lack of a medical explanation was immaterial. That conclusion does not run afoul of 49 CFR section 149(c) (2001). In short, even assuming that the regulation applies, the arbitrator did not usurp an exclusive function of the MRO, as TriMet contends.

■ We turn to the other regulation on which TriMet relies in arguing that the arbitrator was precluded from cancelling grievant's drug test. As noted above, the arbitrator concluded, and ERB agreed, that strict compliance with the specimen collection protocol was required to satisfy due process. TriMet challenges that conclusion, citing 49 CFR section 40.209(b) (2001), which provides that "[n]o person concerned with the testing process may declare a test cancelled based on an error that does not have a significant adverse effect on the right of the employee to have a fair and accurate test." According to TriMet, determining whether the failure to give grievant an additional five minutes of time had a "significant adverse effect" required medical judgment and thus could not be a basis for the arbitrator to cancel the test.

TriMet's argument raises two issues: (1) whether strict compliance was the proper standard for determining whether testing procedures were adequate; and (2) if not, whether medical judgment is required to determine whether the procedures were adequate. However, TriMet does not identify any stage in the proceedings below where it raised either of those issues, and we have not found anything in the record to indicate that the issues were raised. *See* ORAP 5.45(4)(a)(i). Because TriMet's argument appears to be unpreserved, we decline to disturb the arbitrator's and ERB's conclusion that strict compliance with the testing procedure was required. Accordingly, we need not decide whether 49 CFR 40.209(b) (2001) applies.

Because the arbitrator correctly determined that grievant's drug test did not comply with the "shy bladder" protocol, we conclude on that basis that the arbitrator's order declaring the test cancelled does not conflict with DOT regulations and thus is not preempted. Consequently, we need not consider the merits of the other grounds for the arbitrator's order.

TriMet also assigns error to ERB's conclusion that enforcing the arbitration order does not violate public policy. TriMet's arguments in support of that assignment do not differ meaningfully from its other arguments, and they are disposed of by the above analysis.

In summary, we conclude that ERB did not err in determining that TriMet committed an unfair labor practice by failing to comply with the provision in the arbitration order requiring TriMet to reinstate grievant to her former position without submitting to a SAP evaluation.

Affirmed.