Argued and submitted January 14, affirmed on appeal; on cross-appeal, judgment modified to require interest accrual beginning 60 days after December 31, 2000; otherwise affirmed November 24, 2010

Michael COX,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

C & H REFORESTERS, INC.,
an Oregon corporation;
Rick Hall;
Robert Gardner;
Delfino Alejandra;
and George Martinez,
*Defendants-Respondents*
*Cross-Appellants,*

*and*

Jose Mora OCHOA,
*Defendant.*

C & H REFORESTERS, INC.,
an Oregon corporation;
Rick Hall;
Robert Gardner;
Delfino Alejandra;
Jose Mora Ochoa;
and George Martinez,
*Counterclaim Plaintiffs,*

*v.*

Michael COX,
*Counterclaim Defendant.*

Marion County Circuit Court
02C20385; A134742

245 P3d 139

Terrance J. Slominski argued the cause and filed the briefs for appellant - cross-respondent.

Shannon Raye Martinez argued the cause for respondents - cross-appellants. On the combined answering brief and opening brief on cross-appeal were Alan M. Sorem, Randall P. Sutton, and Saalfeld Griggs PC. On the reply brief on cross-appeal were Ryan M. Orr, Randall P. Sutton, and Saalfeld Griggs PC.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

This is a dispute among the shareholders of C & H Reforesters, Inc. (C & H), a closely held corporation in the business of reforestation, clearing brush, and fighting forest fires. Plaintiff Michael Cox, a former employee of C & H and a 20 percent shareholder, filed a complaint pursuant to ORS 60.952,[1] alleging oppressive conduct by the other individual shareholders and seeking to require the individual shareholders and C & H (collectively, defendants) to allow plaintiff to redeem his shares in C & H pursuant to the terms of a stock purchase agreement. With their answer, defendants alleged multiple affirmative defenses and counterclaims, including an affirmative defense of breach of fiduciary duty and counterclaims for breach of contract, fraud, and breach of the duty of loyalty of an employee and controlling shareholder.

After a bench trial, the court determined that plaintiff was entitled to redeem his shares and found the value of those shares to be $146,836. The court determined that, under the terms of the parties' stock purchase agreement, plaintiff was also entitled to interest of $80,677.33.

On defendants' counterclaims, the trial court determined that plaintiff had breached his fiduciary duty and duty of loyalty to defendants through self-dealing, conflicts of interest, nondisclosure of his relationships with competitors, and the diversion of corporate opportunities. The trial court also determined that, by diverting contracts to C & H's competitors and by failing to provide support during a transition to new ownership, plaintiff breached a contractual agreement with defendants. The court rejected defendants' fraud claim.

On defendants' counterclaims for breach of contract and breach of loyalty, the court awarded damages of $232,689, which the court characterized as a "management fee" to compensate C & H for the profits that it lost as a result

---

[1] ORS 60.952 describes proceedings by shareholders of closely held corporations and sets forth remedies that the court may order in resolving disputes between and among shareholders and directors. ORS 60.952(5) describes the court's authority to order the purchase of shares.

of plaintiff's conduct. On the counterclaim for breach of the duty of loyalty, the court required plaintiff to disgorge all compensation received from C & H from 1998 through 2000, in the amount of $132,546. The court ordered that plaintiff's damages be offset against defendants' damages, for a net award to defendants of $137,722.12.

On appeal, plaintiff assigns error to the trial court's application of a marketability discount in the valuation of his shares and to its award of damages to defendants. Defendants cross-appeal, asserting for various reasons that the court erred in awarding interest to plaintiff. Alternatively, defendants contend that the 9.5 percent rate of interest applied by the trial court is too high. We affirm on the appeal without discussion. We write only to address defendants' contentions on cross-appeal and affirm with a slight modification.

We draw the facts relevant to the interest award from the trial court's findings. From the early 1980s until the spring of 2000, plaintiff was a pivotal employee of C & H primarily responsible for bidding on contracts and was, for most of that time, a 50 percent shareholder. In 1997, he began planning for his retirement and, the following March, plaintiff brought new shareholders into C & H by selling them some of his shares, thereby reducing his interest to 20 percent. Plaintiff promised to stay with C & H for a few years to make a successful transition. Under his agreement with the new shareholders, plaintiff retained the right to vote a 50 percent interest in C & H until July 2001, when the new shareholders tendered payment for their shares.

Contrary to his promise, plaintiff did not assist in the transition to new ownership of C & H. Rather, plaintiff began investing in and developing opportunities that were in competition with C & H and in conflict with C & H's interests.

In 1997, plaintiff became a one-third owner of Ferguson Management, a competitor corporation, by investing $60,000 in that company. In 1997 and 1998, plaintiff's wife, Penny Cox, invested in Mountain Forestry, Inc., a contractor for C & H, as well as its competitor, and became a 48 percent shareholder in that corporation. In 1998, 1999, and 2000, Penny Cox made further loans to Mountain

Forestry from the joint checking account she held with plaintiff. From 1999 through 2000, while also working for C & H, plaintiff helped Mountain Forestry to bid against C & H and caused Mountain Forestry to win contracts that C & H had won in the past and to underbid C & H on firefighting contracts. Plaintiff used his position with C & H to divert reforestation jobs to Mountain Forestry. Plaintiff and Penny continued to make additional financial investments in Mountain Forestry.

Plaintiff did not disclose to defendants his investments or dealings with Ferguson Management or Mountain Forestry. Defendants did not learn of plaintiff's work with Mountain Forestry before March 2000. The trial court found that C & H would have had greater financial success in 1999 and 2000 if plaintiff had devoted his full energies to C & H.

Plaintiff and defendants had a stock purchase agreement that required that, on retirement, shareholders must sell their stock to C & H for "the reasonable value thereof." The agreement stated that its purpose was

> "to provide for the orderly continuation of the affairs of corporation in the event of the death or the occurrence of other events specified herein, if any. For the purposes of this Agreement the term 'retirement' means bankruptcy, death, judicial adjudication of incompetence, any arrangement for the benefit of creditors, or the desire to sell of a shareholder. This agreement is entered into with the understanding between the parties that the success and effectiveness of the corporation can be attained and maintained only so long as the individual shareholders thereof are able to devote their personal efforts and talents to the business of the corporation. Such purpose shall be accomplished by the purchase by corporation or its shareholders of the shares of stock held by the shareholder to whom such event has occurred, upon and subject to the terms, covenants and conditions of this Agreement."

Section 2, "PURCHASE AND SALE," stated that "Corporation agrees to purchase and each shareholder agrees to sell and transfer to corporation his shares of stock in corporation at the time, for the consideration and in the manner set forth in this Agreement."

Section 3 of the agreement, "EVENT REQUIRING SALE," required that, on the retirement of a shareholder,

"the affected shareholders shall sell and transfer to corporation and corporation shall purchase all of the shares of the stock in corporation held by such shareholder at a price computed in accordance with the provisions of Section 4, of this Agreement."

Section 4, VALUATION OF STOCK, described the purchase price of each share of stock as

"the reasonable value thereof as may be agreed between the Board of Directors of the corporation or the remaining shareholders as the case may be, and the retiring shareholder * * *. Should agreement not be had, the price thereof shall be determined by arbitration according to the rules of the American Arbitration Association and judgment may be entered thereon."

Section 5, "METHOD OF PAYMENT," described the method of payment for the shares of a retiring shareholder:

"5.1 An amount equal to the purchase price per share (as determined in accordance with paragraph 4) multiplied by the number of shares of capital stock or corporation to be purchased pursuant to paragraph 3 shall be paid to the retiring shareholder or his estate as follows: *In cash, in full, within sixty (60) days following the date upon which the event requiring purchase of the shares occurred, or, at the option of corporation evidenced by appropriate action of its Board of Directors prior to the expiration of such sixty (60) day period, upon notice duly given to shareholder, * * * by a promissory note bearing interest* at a rate per annum equal to that rate at which, on the date of the transfer of said stock, the United States National Bank of Oregon, or its successor, shall certify as its current rate of interest charged on prime residential loans secured by first mortgages, from the date of the event requiring purchase, fully amortized in equal monthly payments, including interest over a ten year period, with the right of corporation or the remaining shareholders to repay at any time without premium or penalty."

(Emphasis added.)

At the 2000 year-end directors' meeting, defendants made it clear that they did not regard plaintiff as a "key

employee" in 2000 and excluded him from sharing in C & H's profits for that year. Late in December, plaintiff informed defendants in writing that he was retiring from C & H effective December 31, 2000, and asked to have his shares redeemed pursuant to the stock purchase agreement.

In November 2002, plaintiff filed the complaint in this proceeding, alleging that C & H had refused to purchase his stock and asking the court to value his shares and order C & H to purchase them. Plaintiff further alleged that the individual shareholders had acted oppressively toward him in (1) failing to purchase plaintiff's stock "when an established value exists"; (2) failing to turn over documents; and (3) failing to equally distribute profits. In his prayer for relief, plaintiff requested the entry of a judgment

"1)   Requiring the purchase of Plaintiff's shares for their fair value in accordance with ORS 60.952(5).

"2)   In the amount of Plaintiff's fair share of any and all distributions since December 2000 with interest thereon at a rate of 9%.

"3)   Any further relief the Court deems appropriate."

In their third amended answer, defendants alleged a counterclaim for declaratory judgment, seeking to enforce the stock purchase agreement, waiving the right to arbitration of the value of plaintiff's shares, and seeking to have the court value the shares. Defendants further alleged that the stock purchase agreement "allows the Corporation to pay the retiring shareholder over a ten year period, with interest on the unpaid balance calculated at the rate of 9.5% per annum with no prepayment penalty." Defendants also sought damages on six additional counterclaims, including breach of contract, fraud, breach of controlling shareholder's duty of loyalty, and breach of employee's duty of loyalty.

Before trial, plaintiff withdrew his allegations relating to oppressive conduct and pursued only his claim for valuation and purchase of his shares pursuant to ORS 60.952(5)[2] and the stock purchase agreement. The trial court

---

[2] ORS 60.952(5) provides, in part:

"(a)   If the court orders a share purchase, the court shall:

found that plaintiff's fiduciary and employment relationship with C & H ended in December 2000, when other shareholders sought to exclude him from active participation as an officer and director. The court determined the value of plaintiff's stock and ordered C & H to redeem plaintiff's shares. Over defendants' objections, the court also ordered defendants to pay simple interest of 9.5 percent to plaintiff from December 31, 2000, the date as of which the court determined that plaintiff had effectively "retired" and was entitled to redeem his shares.[3]

In awarding interest, the trial court explained that it did so pursuant to the stock purchase agreement. The court explained that the stock purchase agreement required the purchase of shares on certain triggering "events" and that it provided for payment in cash within 60 days of such an event or payment by promissory note with interest if cash is not paid within 60 days of the triggering event. The trial court found that plaintiff had retired from C & H effective December 31, 2000, that that was the event that triggered C & H's obligation to purchase the stock, and that plaintiff therefore was entitled to interest under the terms of the agreement from December 31, 2000 until October 11, 2006, the date on which the court had settled the stock repurchase.

In their cross-appeal, defendants contend that the trial court's award of interest was erroneous because the value of the shares was not ascertainable until shortly before judgment. Defendants rely on a line of cases about prejudgment interest on damage awards holding that prejudgment interest may be awarded only if the amount of damages is either ascertained or readily ascertainable. *See Wilson v.*

---

"(A) Determine the fair value of the shares, with or without the assistance of appraisers, taking into account any impact on the value of shares resulting from the actions giving rise to a proceeding under subsection (1) of this section:

"* * * * *

"(C) Specify the terms of the purchase, including, if appropriate, terms for installment payments, interest at the rate and from the date determined by the court to be equitable[.]"

[3] As noted, the trial court also determined that plaintiff had breached his agreement to the shareholders and had breached his duty of loyalty to the corporation as an employee and controlling shareholder. The trial court stated in a letter to the parties that, in their dealings, both sides had behaved with a lack of business ethics.

*Smurfit Newsprint Corp.*, 197 Or App 648, 673, 107 P3d 61 (2005); *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 338, 39 P3d 903, *rev den*, 334 Or 190 (2002) ("[A] trial court may award prejudgment interest on damages only when the exact amount is ascertained or easily ascertainable by a simple computation or by reference to generally recognized standards such as market price and where the time from which interest should run is also easily ascertainable."); *Gerber v. O'Donnell*, 81 Or App 262, 265-66, 724 P2d 916 (1986); *Parsons v. Henry*, 65 Or App 627, 634, 672 P2d 717 (1983), *rev den*, 297 Or 679 (1984). In defendants' view, plaintiff's damages did not become readily ascertainable until the trial court determined the value of plaintiff's shares.

■      Defendants' characterization of the trial court's award as prejudgment interest is incorrect. Plaintiff's complaint did not request prejudgment interest on the purchase of his shares. Rather, plaintiff argued that he was entitled to interest on the value of his shares based on the terms of the stock purchase agreement. Further, the trial court's letter opinion makes clear that its interest award was pursuant to defendants' obligation to purchase the stock under the stock purchase agreement. Thus, plaintiff's entitlement to interest, if any, depends on the terms of the stock purchase agreement and not on the rules regarding the availability of prejudgment interest, and is an issue of law that turns on interpretation of the agreement. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997).

In awarding interest, the trial court relied specifically on that portion of the stock purchase agreement that requires the payment of

"cash in full, within sixty (60) days following the date upon which the event requiring purchase of the shares occurred, or * * * by a promissory note bearing interest[.]"

C & H did not purchase plaintiff's shares for cash within 60 days of plaintiff's retirement; accordingly, the trial court explained, the agreement required the payment of interest on the amount owed for the shares:

"[Paragraph 5.1 of the stock purchase agreement] requires defendants to pay interest on the stock value from the date of the event requiring purchase, or December 31, 2000, to

October 11, 2006, the date this court, by awarding defendants damages in excess of the stock's value, in effect settled the stock repurchase. Thus, the interest rate shall be calculated as of the aforementioned dates using the formula reflected in [the stock purchase agreement]. *Were the court to ignore the parties' agreement, companies could avoid the obligation to pay interest on stock repurchases by simply disputing the amount due. The agreement provides a means to obtain a purchase price if disputed, but it does not toll the interest due on the ultimate amount owed during the period of dispute, which in this case was quite lengthy.*

"Defendants' argument that they had damages claims against plaintiff for the same period does not render unenforceable the terms of the parties' agreement with respect to the sale of stock. Defendants never asked the court to rescind the parties' Stock Purchase Agreement. In fact, defendants' First Counterclaim of the Third Amended Answer asked this court to find the stock purchase agreement to be valid and enforceable and asks that the court permit it to pay the stock value, with interest at a rate of 9.5% over a ten year period. So, defendants cannot now ask the court to not award interest."

(Emphasis added.) As the italicized portion of the trial court's opinion expressed, the court was concerned that if no interest were allowed, then a party could delay indefinitely the obligation to pay, simply by disputing the amount owed.

Defendants dispute that interpretation, contending that a careful reading of the stock purchase agreement shows that, necessarily, C & H's obligation to purchase the shares of a retiring shareholder arose only after the purchase price had been determined. In defendants' view, because the shares were not valued until the trial court issued its findings on October 11, 2006, the purchase could not possibly have taken place before then, and no interest could have accrued before that time.

Defendants point to several provisions of the stock purchase agreement that they assert support their interpretation. They note that Section 3 of the agreement provides that the purchase shall be "at the price computed in accordance with the provisions of Section 4," necessarily requiring

that the purchase occur after the price is determined. Additionally, defendants point out that Section 5 of the agreement, "METHOD OF PAYMENT," provides that the retiring shareholder shall be paid "[a]n amount equal to the purchase price per share *(as determined in accordance with paragraph 4)* multiplied by the number of shares of capital stock of corporation to be purchased[.]" (Emphasis added.) Also, defendants note, the stock purchase agreement does not specify a time limitation for the valuation of the shares. Finally, defendants contend, no interest is owed because C & H's directors did not exercise an option in Section 5 to pay plaintiff for his shares over time, as provided in the stock purchase agreement. All of those provisions, in defendants' view, point to the conclusion that no interest is owed.

■     Defendants are correct that the agreement required the parties to determine a value for the shares and that no time limitation was placed on that determination. Defendants also are correct that the agreement required that the retiring shareholder be paid the purchase price as determined in accordance with the agreement and that the directors could elect to pay that amount by promissory note instead of cash. However, the fact that no payment could be made, as a practical matter, until a value had been determined, does not answer the question of whether or when the payment obligation began to accrue interest. The agreement unambiguously stated that a shareholder's retirement, not the valuation of the shares, was the "event" that required the purchase of shares. The agreement further required that, within 60 days of that event, the retiring shareholder "shall be paid" in cash or by promissory note payable over 10 years, with interest. Thus, after plaintiff announced his retirement, C & H had two options for purchasing his shares: payment in cash within 60 days of plaintiff's retirement, or payment by promissory note—with interest—within 60 days of retirement. C & H did not do either, in part because the parties could not agree on a purchase price for the shares. However, contrary to defendant's contention, the failure to agree on a purchase *price* did not postpone C & H's payment *obligation*. Under the unambiguous terms of the stock purchase agreement, that obligation accrued 60 days from the date of plaintiff's retirement. Had the stock purchase agreement been

performed pursuant to its terms, plaintiff would have been paid for his shares, either in cash or by promissory note, within 60 days of his retirement. And if payment had been made by promissory note, the agreement expressly provided for payment of interest. We conclude that, in enforcing the terms of the agreement, the trial court correctly interpreted the agreement to require the payment of interest on the value of plaintiff's shares, as determined by the court, from the date on which defendants' payment obligation accrued.

*Gerber*, on which defendants rely, is distinguishable. In that case, the plaintiff withdrew from a partnership for the purchase and renovation of an office building and sought a buyout pursuant to the terms of the partnership agreement. 81 Or App at 264. The partnership agreement stated that the withdrawing partner would be paid "the amount determined according to paragraph 24 and the subparagraphs relating thereto within 120 days from the date of termination or withdrawal." The agreement further required an appraisal to determine the market value of the building within 60 days of the withdrawal. The appraisal was not completed until more than nine months after the plaintiff's withdrawal, and the plaintiff agreed to extend the time for payment of his partnership interest to 60 days from that date. The parties could not reach an agreement as to the plaintiff's share, however, and the plaintiff filed a lawsuit. *Id.* at 264-65. On appeal of the trial court's judgment, the plaintiff challenged the trial court's failure to award prejudgment interest. This court said that, once the appraisal was completed, the exact amount owing the withdrawing partner was easily ascertainable with reference to the partnership agreement; for that reason, this court explained, the accrual of prejudgment interest commenced 60 days after the date on which the appraisal was made available. *Id.* at 266.

In defendants' view, *Gerber* stands for the requirement that the value of a plaintiff's interest must be easily ascertainable before prejudgment interest can accrue and that, if an appraisal must be completed to determine damages, then damages are not ascertainable until the appraisal is completed. As we have previously noted, however, unlike in *Gerber*, this case does not involve a claim for prejudgment interest; rather, it involves plaintiff's entitlement to interest

on the payment for his shares under the terms of the stock purchase agreement. Also unlike in *Gerber*, here, the stock purchase agreement included an express provision for payment of interest and did not make the accrual of C & H's obligation to pay contingent on a valuation of plaintiff's interest. *See* 81 Or App at 262, 264. Rather, C & H's obligation to redeem arose 60 days after plaintiff's retirement. The fact that the parties could not agree on a payment amount by that date did not postpone the accrual of the obligation.

■        Finally, defendants contend that, in the event that plaintiff is entitled to interest under the stock purchase agreement, the rate must be based on the then-current rate of interest charged on prime residential loans as of the date the stock transferred, October 11, 2006. In defendants' view, the trial court erroneously applied a 9.5 percent rate of interest. In a motion to reopen the record filed after the trial court issued its judgment, which the trial court denied, defendants offered evidence that the then-current rate of interest at the United States National Bank of Oregon was lower than 9.5 percent. Defendants contend that the trial court erred in denying their request to reopen the record and consider that evidence.

The trial court did not err. Defendants filed their original answer with affirmative defenses and counterclaims in January 2003. That pleading stated that C & H should be required to pay plaintiff for his shares over a period of 10 years with interest at "9.5% per annum." Over the course of this litigation, defendants amended their answer and affirmative defenses and counterclaims three times, and each time alleged the same rate of interest. Defendants' third amended answer, filed in November 2005, included that same allegation. At no time before trial did defendants move to strike the allegation or attempt to amend it. In his written closing argument and in his response to defendants' closing argument, plaintiff asserted that, under the terms of the stock purchase agreement, he was entitled to the value of his stock as of December 31, 2000, plus interest of 9.5 percent from that date. The rate of interest accordingly was not an issue at trial.

Only after the trial court had issued its general judgment including interest at a rate of 9.5 percent did defendants complain that the interest rate was too high and not consistent with the terms of the stock purchase agreement, and seek to reopen the record to introduce evidence of a lower rate and to amend their pleadings to conform to that evidence.[4] Defendants now complain in their cross-appeal that the trial court erred in its award of that rate of interest and in disallowing defendants' motion to reopen the record to consider evidence of the rate in effect on December 31, 2000.

We conclude that defendants' pleadings over a period of almost three years alleging that defendants' obligation to plaintiff should be paid by promissory note with an interest rate of 9.5 percent was a judicial admission that removed the issue of the interest rate from consideration at trial. *See Great Seneca Financial Corp. v. Lisher*, 223 Or App 496, 500, 196 P3d 86 (2008) (A judicial admission is a formal concession in pleadings or stipulations that withdraws a fact from issue, and is made for the purpose of dispensing with proof of a fact in issue.). In light of those pleadings, the trial court did not err in applying a 9.5 percent rate of interest and, further, did not abuse its discretion in denying defendants' request after judgment to reopen the record to consider evidence of a lower rate. *Safeport, Inc. v. Equipment Roundup & Mfg.*, 184 Or App 690, 699-701, 60 P3d 1076 (2002), *rev den*, 335 Or 255 (2003) (setting out the applicable abuse of discretion analysis).

We note that, in enforcing C & H's obligation to purchase the shares, the trial court ordered that interest accrue from December 31, 2000. In fact, under the terms of the stock purchase agreement, interest began to accrue 60 days from December 31, 2000, and the trial court's judgment is modified accordingly.

Affirmed on appeal; on cross-appeal, judgment modified to require interest accrual beginning 60 days after December 31, 2000; otherwise affirmed.

---

[4] Defendants apologized to the trial court for the "typo" in their pleadings requesting interest at the rate of 9.5 percent.